J. St. Girard JORDAN, Plaintiff,

v.

SMITHKLINE BEECHAM, INC., Defendant.

Civil Action No. 95–5705.

United States District Court, E.D. Pennsylvania.

April 3, 1997.

---

1. Any such motion must address both the sub- stantive issues and the choice of law questions.

Richard L. Gerson, Willan F. Joseph, Philadelphia, PA, for Plaintiff.

M. Frances Ryan, Frederick G. Herold, Dechart, Price & Rhoads, Philadelphia, PA, for Defendant.

## MEMORANDUM

BUCKWALTER, District Judge.

### I. INTRODUCTION

Plaintiff J. St. Girard Jordan ("Plaintiff") has brought this action against SmithKline Beecham, Inc. ("SmithKline") alleging discrimination and other claims related to his employment with SmithKline.

Currently before the Court is defendant SmithKline's Motion for Summary Judgment and the response of Plaintiff thereto. For the following reasons, SmithKline's motion will be granted.

### II. STATEMENT OF FACTS [1]

#### A. Plaintiff's Work History

Plaintiff first joined SmithKline in 1963. Deposition of J. St. Girard Jordan ("Jordan Dep.") at 11. In 1970, Plaintiff left SmithKline in order to attend law school. Jordan Dep. at 12. Plaintiff returned to SmithKline in 1974 and worked as an attorney in SmithKline's Law Department until 1989, when he resigned under the terms of an enhanced separation package.

During Plaintiff's career at SmithKline, he was promoted a number of times. Jordan Dep. at 15–18. Plaintiff became General Counsel for the Animal Health and Consumer Product business groups and, by 1986, he became Assistant General Counsel for the corporation. Jordan Dep. at 18. Plaintiff

---

1. The following facts are based on the evidence of record viewed in the light most favorable to Plaintiff as the nonmoving party, as required when considering a motion for summary judgment. *See Sempier v. Johnson & Higgins,* 45 F.3d 724, 727 (3d Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 2611, 132 L.Ed.2d 854 (1995).

received steady salary increases and periodic merit bonuses, so that by 1988–89 he was earning $104,507.00 per year. *See* Smith-Kline Beecham's Motion for Summary Judgment ("SmithKline's Motion") at Exhibit ("Ex.") A–1. Plaintiff also received significant stock option grants between 1979 and 1988, that due to increases in stock prices, had a value of approximately $500,000 after they vested and he exercised them. Jordan Dep. at 64–67.

### B. *The December 1988 VRIF*

In 1988 SmithKline underwent a reorganization. Jordan Dep. at 96. In addition, rumors circulated during this same time period regarding the possibility of a merger with a British company.[2] SmithKline's Motion at Exhibit A, ¶ 9; Jordan Dep. at 96, 108–112. The reorganization and the likelihood of a merger caused uncertainty among Smith-Kline's executives and employees about job security, since it appeared that the company would have to change or eliminate positions. *Id.*

In late 1988, SmithKline decided to offer employees in certain business groups the chance to voluntarily resign in exchange for enhanced severance benefits so that the company would have to fire fewer people, making the anticipated reorganization and/or merger smoother. The voluntary resignation program was titled "Voluntary Reduction in Force" ("VRIF"). SmithKline's Motion at Ex. A, ¶ 2; Jordan Dep. at 97–99.

In November 1988, the Chief Executive Officer of SmithKline sent a letter to employees from selected business groups, including Jordan's group, offering a VRIF opportunity. The VRIF package included the following terms:

1. The employee had to sign a general release in order to receive the benefits;

2. The employee had to sign up for the VRIF program by December 7, 1988;

3. The employee had to work until the completion of the assignment as specified by the Company, up to one year;

4. If a long-term employee (like Jordan) complied with the terms of the program, he or she would receive:

 (a) Enhanced severance benefits

 (b) Enhanced pension benefits

 (c) A 6–month extension of medical and dental benefits

 (d) Pay for 1989 vacation and personal days.

*See* SmithKline's Motion at Exs. A–2, A–3 and A–4.

Plaintiff decided to accept the VRIF package on December 7 or 8, 1988, with his last day of work to be in July 1989. Jordan Dep. at 107–110, 115. Plaintiff testified that he liked the company and that the decision to resign was a very difficult one that was motivated primarily by uncertainty concerning whether his position would survive the reorganization and/or the expected merger. Jordan Dep. at 135–38.

### C. *The January 1989 Stock Option Grant*

In January 1989, after Jordan declared his decision to resign under the VRIF program, SmithKline granted stock options to designated management level employees who had either decided to remain with the company or had rescinded their acceptances of the VRIF package. SmithKline's Motion at Ex. A, ¶¶ 7–8. Consistent with this policy, Smith-Kline did not offer the stock option grant to Plaintiff or to any other employee who had accepted the VRIF package. *Id.*

### D. *The January 1989 Board Resolution*

In late January 1989, the SmithKline Board of Directors passed a resolution which stated that the Corporate staff employees who had not taken the VRIF package or revoke their acceptances of it, would still be eligible for the enhanced VRIF separation package *if* there was a "change in control" of the corporation and their positions were involuntarily terminated during the following 24 months. *See* SmithKline's Motion at Ex. A–10. The resolution did not guarantee that any position would remain after the merger; in fact, it addressed what would happen to

---

**2.** A merger between SmithKline Beckman and Beecham was finally announced in April 1989.

severance benefits if the company had to eliminate positions.

When it became clear in early April 1989 that a change was imminent, Henry Wendt, the Chief Executive Officer, circulated a memorandum to "All Corporate Staff Employees" (of which Jordan was one) which announced the substance of this resolution— namely that they (the corporate staff) would be entitled to the enhanced severance package if their jobs were eliminated within 24 months from January 25, 1989. *See* Smith-Kline's Motion at Ex. A, ¶¶ 10–11; Ex. A–11; Ex. B, ¶ 6; and Exhibit C, ¶ 4. Plaintiff testified that he does not recall having seen this memorandum "but if it went to all corporate staff employees, I should have seen it." Jordan Dep. at 347. Plaintiff also testified that he had no reason to believe that this document did not go to all corporate staff employees and stated that "[o]ften times the policy was to or procedure, I should say, was posted on the Board, it may have been posted or it may have gone out, but if someone said that they did either one, I would accept that." Jordan Dep. at 347.

A very limited number of SmithKline employees, who like Plaintiff, took the VRIF package in December 1988, later decided to revoke their resignations. SmithKline's Motion at Ex. A, ¶ 5. Plaintiff testified that he understood that he could have revoked his VRIF election and that he had discussions with his supervisors about it. Jordan Dep. 144–51. He decided not to revoke his acceptance, however, because he did not receive assurances that his position would survive a reorganization or a potential merger and he was concerned that he would lose the VRIF benefits. Jordan Dep. at 151–52. Plaintiff remained as a SmithKline employee until July 14, 1989, at which point his resignation became effective.

### E. *The Release*

Pursuant to his VRIF election, Plaintiff signed a general release which contained a covenant not to sue.[3] *See* SmithKline's Motion at Ex. A–5. During Plaintiff's exit interview with Sheila McDowell on or about June 14, 1989, Plaintiff acknowledged that he had signed the release and that he had completed his agreed-upon term of employment so that he was eligible for the enhanced severance package. *See* SmithKline's Motion at Exs. B–4 and B–5. The severance election form, which plaintiff signed during this interview, informed those who resigned voluntarily: "You will not receive severance pay if you do not execute the General Release form." SmithKline's Motion at B–5; Jordan Dep. at 163–64. Plaintiff testified that he understood that he was obligated to "sign and return the General Release form and work until the conclusion of [his] assignment" in order to receive the benefits. Jordan Dep. at 180.

### F. *SmithKline's Payments to Plaintiff*

Following his last day of employment in July 1989, Plaintiff received $172,437 in severance pay plus back vacation pay, an enhanced pension program, continued medical benefits and all of the other promised components of the VRIF package. Jordan Dep. at 118–119; SmithKline's Motion at Ex. A, ¶ 12. To this date, Plaintiff has never offered to refund the corporation for the enhanced severance benefits he received. SmithKline' Motion at Ex. A, ¶ 12.

In addition, Plaintiff negotiated a 2 1/2 year consulting arrangement and stayed on as a consultant for the SmithKline Consumer Product Division. Jordan Dep. at 147, 218–24. Pursuant to this consultant's agreement, Plaintiff was to earn $2,550 per week for 25 1/2 hours of work or approximately $132,600 per year. Jordan Dep. at 223–24. In early 1990, approximately eight months into Plaintiff's consulting arrangement, SmithKline underwent another reorganization and had to terminate Plaintiff's agreement. Jordan

---

**3.** In the general release, Plaintiff agreed to release and discharge:

SmithKline Beckman Corporation, its ... successors ... from all claims and/or causes of action, known or unknown, which I may have or claim to have against the Company arising from or during my employment or as a result of the termination of my employment, and I hereby agree not to sue the Company on any such claim or cause of action. This release includes but is not limited to claims arising under federal, state or local laws prohibiting employment discrimination....

Dep. at 229–30. Although Plaintiff stopped working for SmithKline at that time, he later received a final payment in 1990 of $137,222 under this agreement. Jordan Dep. at 231–33. That same year, SmithKline also gave Plaintiff a bonus of $23,300 for the seven and a half months he worked at the company in 1989. SmithKline's Motion at Ex. A, ¶ 13.

As set forth above, between December 1988 (when Plaintiff announced his decision to resign) and the middle of 1990 (when Plaintiff's consulting agreement ended), Plaintiff received the following compensation from SmithKline:

* Seven and a half months worth of his annualized salary of over $104,507 for his seven and a half month period of employment in 1989
* Severance pay of $172,437
* Continued medical and dental payments, payment for unused vacation days and eligibility for enhanced pension benefits
* A $23,300 bonus for his seven and a half months work in 1989
* $2,550 per week for the approximately eight months that he worked under the consulting agreement
* $137,222 in payment when SmithKline terminated his consulting agreement

After he resigned, Plaintiff also exercised his accumulated stock options and received approximately $500,000 more. Jordan Dep. at 64–67.

### G. *Procedural History and Plaintiff's Current Claims*

On July 12, 1993, approximately four and one half years after the January 1989 stock option grant, Plaintiff filed a Praecipe for a Writ of Summons in the Philadelphia Court of Common Pleas. SmithKline's Motion at Ex. D. Plaintiff's Civil Cover Sheet indicated that he would file a contract claim worth more than $50,000.

The parties eventually removed the case to this Court based on diversity of jurisdiction. Subsequently, Plaintiff filed a Complaint which contained two counts. SmithKline's Motion at Ex. E. In Count I, Plaintiff stated that SmithKline should have included him in the stock option grant in 1989 and he sought

cash value of this grant. In Count II, Plaintiff alleged that the bonus he received for his seven and one half months of work in 1989 was less than he should have received and he sought payment of more money to make up for an unspecified alleged shortfall.

This case was later remanded to the Court of Common Pleas due to a jurisdictional defect. After a passage of time, Plaintiff hired another attorney and notified counsel for SmithKline in August 1995 that Plaintiff had decided to amend his complaint to add a federal race discrimination charge and other similar claims. SmithKline then removed the case to this Court again, this time on the basis of the proposed new federal statutory claims.

Shortly before filing the Amended Complaint, Plaintiff filed a charge of race discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC"). *See* SmithKline's Motion at Exs. F and G. His charge read, in its entirety, as follows:

I am the victim of racial discrimination by my former employer, SmithKline Beecham, Inc. ("SmithKline").

On or about February 13, 1995, I learned that SmithKline favored similarly situated white employees over me with regard to the terms and conditions of my employment. Specifically, SmithKline in 1989 discriminated against me with regard to a separation package that the company offered.

White employees were given favorable treatment and offered the opportunity to revoke acceptance of a separation package to retain their jobs and if terminated within 24 months to retain entitlement to the enhanced separation package. I was not given the opportunity and thereby discriminated against and suffered detrimentally with respect to the terms and conditions of my employment.

SmithKline's Motion at Ex. F.

After the case was removed to this Court, Plaintiff moved for leave to amend his complaint to add his new claims. On December

21, 1995, Plaintiff filed his Amended Complaint, which contains the following claims:

Count I: The original stock option claim

Count II: The original bonus claim

Count III: A claim for breach of the covenant of good faith and fair dealing with respect to "negotiations" concerning Plaintiff's employment and termination, based on SmithKline's purported failure to inform Plaintiff of the January 1989 board resolution extending VRIF eligibility.

Count IV: A Title VII claim for race discrimination, including a claim that Plaintiff was constructively discharged, based on SmithKline's purported failure to inform Plaintiff of the January 1989 board resolution extending VRIF eligibility.

Count V: A race discrimination charge under 42 U.S.C. § 1981 based on the same claim.

Count VI: A race discrimination charge under the Pennsylvania Human Relations Act based on the same claim.

Count VII: A claim for negligent misrepresentation due to a "non-communication" of information by SmithKline, again based on the company's purported failure to inform Plaintiff of the January 1989 board resolution extending VRIF eligibility.

Defendant SmithKline responded with an Amended Answer, as well as two similar Counterclaims. SmithKline's Counterclaims allege that Plaintiff violated the terms of the general release he executed in order to receive his VRIF benefits and breached the covenant not to sue contained in the release when he filed the instant lawsuit.

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate only when the admissible evidence fails to demonstrate a dispute of material fact and the moving party is entitled to judgment as a matter of law. Sempier v. Johnson & Higgins, 45 F.3d 724, 728 (3d Cir.), cert. denied, —— U.S. ——, 115 S.Ct. 2611, 132 L.Ed.2d 854 (1995). When the moving party (here, SmithKline) does not bear the burden

of persuasion at trial, the moving party must show that the nonmoving party's (here, J. St. Girard Jordan) evidence is insufficient to carry its burden of persuasion at trial. Id.; Celotex Corp. v. Catrett, 477 U.S. 317, 323–25, 106 S.Ct. 2548, 2552–54, 91 L.Ed.2d 265 (1986). Thereafter, the nonmoving party creates a genuine issue of material fact if sufficient evidence is provided to allow a reasonable jury to find for him at trial. Anderson v. Liberty Lobby, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

### B. Argument

#### 1. The Release

■ As discussed earlier, Plaintiff signed a release that contained a covenant not to sue on December 7, 1988 in order to be eligible to receive the VRIF package. Plaintiff also reaffirmed the release in the severance election form that he signed in his exit interview in June 1989.

As a threshold issue, SmithKline asserts that Plaintiff's claims are barred solely on the basis of this release because (1) Plaintiff ratified the release by not returning the consideration he received and (2) Plaintiff has not identified any misrepresentation on which he bases his claims of fraud. In response, Plaintiff argues that this release does not bar his claims because (1) certain causes of action accrued and were discovered after the release was signed and (2) SmithKline made material misrepresentations to secure the release. I agree with SmithKline's arguments and adopt them as follows.

■ A long line of Pennsylvania cases hold that a release covers only those matters which may be fairly said to have been within the contemplation of the parties when the release was given. Restifo v. McDonald, 426 Pa. 5, 230 A.2d 199, 201 (1967) (citations omitted). Therefore, as Plaintiff correctly argues, the general words of the release "will not be construed as to bar the enforcement of a claim which has not accrued at the date of the release." Id.

■ However, a party cannot evade the clear language of the release by contending

that he did not subjectively intend to release the claim in question. *Buttermore v. Aliquippa Hosp.*, 522 Pa. 325, 561 A.2d 733, 735 (1989). Likewise, where a release includes unknown claims, a party cannot avoid its effect by arguing that he did not know of the matter in question when he signed the release. *Id.; See also Emery v. Mackiewicz*, 429 Pa. 322, 240 A.2d 68, 70 (1968) (release of unknown claims bars claims of injuries which were discovered after the execution of the release).

In this case, Plaintiff's claims arose out of his employment or the termination of his employment, subjects specifically covered in the Plaintiff's general release. Additionally, Plaintiff signed the severance election form, thereby reaffirming his intent to release all claims in exchange for payment of enhanced severance in the amount of $172,437. This reaffirmation of his release clearly occurred after all of the events which form the basis of the suit that Plaintiff now seeks to assert.

██ Plaintiff next contends that the release is void because it was induced by fraud. However, Plaintiff completely ignores the argument that a claimant may not seek to invalidate a release based on purported fraud where he failed to return to the other party the consideration he received for the release. Plaintiff's failure to do so constitutes ratification of the release. *See Blistein v. St. John's College*, 74 F.3d 1459, 1466–67 (4th Cir.1996) (plaintiff who released all claims arising from termination of employment was barred from pursuing claim because he ratified the release by retaining the severance benefits after he discovered the purported basis for voiding the release)[4]; *Blakeney v. Lomas Info. Sys., Inc.*, 65 F.3d 482, 485 (5th Cir. 1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1042, 134 L.Ed.2d 189 (1996) (same)[5]; *Pon-*

*zoni v. Kraft General Foods*, 774 F.Supp. 299, 316 (D.N.J.1991), *aff'd*, 968 F.2d 14 (3d Cir.1992) (same).

██ More fundamentally, Plaintiff has still not identified the misrepresentation upon which he bases his claim of fraud. In order to state a prima facie case of fraud, a plaintiff must show

(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.

*Gibbs v. Ernst*, 538 Pa. 193, 647 A.2d 882, 889 (1994). The misrepresentation must be "a misrepresentation of a past or present material fact"—"a prediction of a future event is not a misrepresentation." *BMB Assocs. v. Ortwein*, 1994 WL 314330, at *4 (E.D.Pa. June 29, 1994), *aff'd*, 60 F.3d 813 (3d Cir. 1995).

In this case, it appears that Plaintiff has only alleged the "non-communication" of the possibility of a future event—the possibility that in January 1989 the Board would decide to pass a resolution that changed the VRIF rules for certain employees who had not yet accepted the VRIF package or who had elected it and then revoked the election. Plaintiff has offered no evidence that anyone in the Company knew on December 8, 1988 when Plaintiff first signed the release that the Board would pass a resolution in January 1989.

Plaintiff, however, contends that this board resolution may not have been a future event because SmithKline may have contemplated

---

4. In *Blistein*, the plaintiff had not even signed the release form which his employer had requested that he sign. 74 F.3d at 1464. The court still found an implied release because the employee had clearly elected to participate in the voluntary retirement program in exchange for valuable benefits and had failed to return the benefits before bringing suit. *Id.* at 1466–67.

5. In *Blakeney*, the court refused to permit a plaintiff who had released all claims "growing out of any legal restrictions on the company's

right to terminate its employees" to bring a claim based on the company's failure to rehire the plaintiff after he had executed the release. 65 F.3d at 484. The court held that such a claim is not a "future claim," but rather is simply an attempt to revive a claim the plaintiff was paid to release. *Id.* at 485. Since the claim arose out of the termination, it was barred by the release which the plaintiff had ratified by refusing to return the consideration that the company had paid. *Id.*

allowing certain employees to revoke their VRIF acceptances before December 7, 1989 and therefore misled Plaintiff into signing the release by representing that he would lose the enhanced benefits. In making this argument, Plaintiff ignores the evidence that, in a memorandum dated April 6, 1989, Smith-Kline informed "All Corporate Staff Employees" of the very facts which Plaintiff claims that the company concealed from him. As Plaintiff re-affirmed his general release after this disclosure, he cannot sustain the claim that the Court should invalidate the release due to fraudulent concealment.[6]

Although SmithKline is entitled to summary judgment solely on the basis of the release, I will address Plaintiff's additional claims.

### 2. Count I—Contractual Right to the January 1989 Stock Option Grant

In Count I of the Amended Complaint, Plaintiff alleges a breach of contract claim as he contends that SmithKline should have included him in the January 1989 stock option grant. SmithKline argues that (1) Plaintiff's claims are barred by the statute of limitations and (2) Plaintiff cannot prove that he had a contract which required SmithKline to issue any stock options to Plaintiff. As I agree that SmithKline retained the authority to determine which of its employees would receive stock options, I conclude that Plaintiff did not have a contractual right to the 1989 stock option grant.[7]

In order to prove an enforceable contract in which an employer grants a specific benefit to an employee, the employee must prove that the employer communicated an intentional offer with definite terms, that the employer intended to be bound by the offer and that the employer made the offer to induce the employee to accept or continue employment with the company. *Morosetti v.*

*Louisiana Land and Exploration Co.,* 522 Pa. 492, 564 A.2d 151, 152 (1989).

In *Morosetti,* the Pennsylvania Supreme Court held that employees did not have a contractual right to severance pay despite the fact that the company had a policy of granting it. The court held that it was insufficient for an employee to show that the employer occasionally granted these benefits or even that the employer had a policy awarding these benefits to all employees. *Morosetti,* 564 A.2d at 152–53. In support of its conclusion, the court reasoned that

> It is basic contract law that one cannot suppose, believe, suspect, imagine or hope that an offer has been made.... Nor can one be bound because they are contemplating making an offer, or that they would or should have or that someday they might. A company may indeed have a policy upon which they intend to act, given certain circumstances or events, but unless they communicate that policy as part of a definite offer of employment they are free to change as events may require.

*Id.*

As in *Morosetti,* Plaintiff has only alleged that SmithKline had a program for stock option grants and that SmithKline had granted Plaintiff stock options in the past. Amended Complaint at ¶¶ 13–15. Plaintiff does not contend that anybody ever promised to grant him the January 1989 stock option grant; rather he only claims that he was among the employees of the corporation who were eligible to receive stock option grants. Amended Complaint at ¶ 14.

Moreover, the documents governing SmithKline's stock option program provide that the company retained the discretion at all times to select the persons to receive the options and to determine the number of shares to be distributed. *See* SmithKline at Ex. A, ¶¶ 6–8; Ex. A–6 at 3 (May 20, 1997

---

6. In his deposition, Plaintiff states that he does not recall having seen this memorandum "but [as] it went to all corporate staff employees, I should have seen it." Jordan Dep. at 347. Plaintiff also testified that he had no reason to believe that this document did not go to all corporate staff employees and stated that "[o]ften times the policy was to or procedure, I should say, was posted on the Board, it may have been

posted or it may have gone out, but if someone said that they did either one, I would accept that." *Id.*

7. As I will reach a decision on the merits, I will not address SmithKline's statute of limitations argument in this instance.

Prospectus); Ex. A–8 at 1 (Incentive Compensation Plan). Thus, as Plaintiff has no contractual right to the grant, his claim fails.[8]

### 3. Count II—Contractual Right to a Larger Bonus

In Count II of the Amended Complaint, Plaintiff alleges that SmithKline "paid Plaintiff a bonus in 1990 which represented less that [sic] 50% of the amount Plaintiff should have received for employees in the same management level." Amended Complaint at ¶ 29.[9] SmithKline argues that Plaintiff cannot prove a right to a larger bonus as (1) the level of bonuses was within the company's discretion and (2) SmithKline never promised Plaintiff a particular bonus.

As discussed above, the burden falls upon the employee to prove a definite offer to pay an additional benefit. *Morosetti*, 564 A.2d at 152–53. In this case, Plaintiff testified that the level of bonuses for individual employees was within the discretion of the corporation.[10] Since Plaintiff admits that he had no contract for payment of a bonus at any particular level for service rendered in 1989, I conclude that SmithKline is also entitled to judgment on Count II of the Amended Complaint.

### 4. Race Discrimination Claims

Plaintiff asserts race discrimination claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* (Count IV), under 42 U.S.C. § 1981 (Count V) and under the Pennsylvania Human Relations Act, 43 Pa.S.A. § 955(a) (Count VI).

Again, SmithKline's attack on Plaintiff's allegations is two-pronged. First, SmithKline contends that Plaintiff did not promptly file his claims with the EEOC and therefore his charges are time-barred. Second, SmithKline argues that Plaintiff has adduced no evidence that the company's decision was pretextual. Plaintiff disputes the alleged untimeliness and further suggests that he was not informed of the opportunity to revoke his VRIF acceptance due to his race.

I agree with SmithKline that Plaintiff did not file his claims within the time period allotted under the statute of limitations and that Plaintiff has not provided any evidence of discrimination.

#### a. Statute of Limitations

Under Title VII, a plaintiff may bring suit within 180 days of the alleged discrimination; however, if the plaintiff initially filed a complaint with a state or local agency with the authority to adjudicate the claim, he or she is allotted 300 days from the date of the alleged discrimination within which to file a charge of employment discrim-

---

**8.** SmithKline also argues that Plaintiff was ineligible for the stock option grant for the additional reason that a grantee could not exercise this stock option grant unless he or she remained with the company for a year or more and that Plaintiff would be leaving before this time expired. *See* SmithKline's Motion at Ex. A–7, D000534. Plaintiff counters that SmithKline should have included him in the stock option grant because the corporation later accelerated the exercise date as part of the Beecham merger. As such, Plaintiff concludes that SmithKline could not exclude him on the basis that only employees who planned to remain with the company for a year or more were eligible.

Plaintiff's argument fails because the exercise date is irrelevant. Here, SmithKline retained the discretion to determine which employees would receive stock options. *See* SmithKline's Motion at Ex. A, ¶¶ 6–8; Ex. A–6 at 3; Ex. A–8 at 1. As stock options served to provide incentive for future performance, SmithKline had the right to offer them only to employees who either revoked their VRIF acceptances or who elected to remain with the company. *See* SmithKline's Motion at Ex. A, ¶ 8.

**9.** In 1990, Plaintiff received $23,300 for his seven and a half months of employment before his resignation on July 14, 1989.

**10.** In particular, Plaintiff stated that "the very nature of bonuses is with discretion. I mean, bonus is something that's not guaranteed, that's the very nature of the bonus." Jordan Dep. at 62–63. Plaintiff then testified as follows:

Q: Did anyone at SmithKline ever promise you either orally or in writing, that you would get a bonus at a certain level for services rendered in 1989?
A: Not to my knowledge, no. No, I mean, it's accepted, as a matter of general operating policy since I've been there, that if the corporation met certain levels of profitability, they paid bonuses. Now, no one went around and told individuals that you were going to get that bonus because it was an accepted policy of the corporation year in year out. No one tapped me on the shoulder and said, 'Jack, you're getting a bonus next year.'
Jordan Dep. at 63.

ination with the EEOC. 42 U.S.C. § 2000e–5(e).[11]

 In order to extend this time period in which to file charges of discrimination, a plaintiff may invoke the discovery rule.[12] Under the discovery rule, a plaintiff may toll the time limit for filing a charge until he "has discovered, or, *by exercising reasonable diligence, should have discovered* (1) that he or she has been injured, and (2) that the injury has been caused by another party's conduct." *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1386 (3d Cir.1994) (emphasis added).

 The awareness which is at issue under the discovery rule is the plaintiff's awareness or constructive awareness of his "actual injury," not the awareness that this injury constitutes a legal wrong. *Id.* at 1386. In order to take advantage of the discovery rule, the plaintiff must "take reasonable measures to uncover the existence of an injury." *Id.* at 1390.

In *Oshiver*, the defendant (a law firm) dismissed plaintiff (an attorney) on April 10, 1990 with the explanation that the firm did not have sufficient work to sustain her position. *Id.* at 1384. On May 21, 1991 at a hearing to secure unemployment compensation, plaintiff discovered that the firm had instead hired a male attorney to assume her former duties. *Id.* at 1385. The district court granted defendant's motion to dismiss, holding that plaintiff's claims were time-barred as the statutory limitations period had begun to run on the day that the firm dismissed her. *Id.*

On appeal, the Third Circuit ruled that the discovery rule does not preserve a claim where the claimant knew of her injury (the fact that she was no longer employed) but she did not discover some of the alleged evidence (the fact that the firm had replaced her with a male attorney) until it was too late to file a claim. *Oshiver*, 38 F.3d at 1391.

In this case, Plaintiff contends that he did not discover that he had a legal claim against SmithKline until February 1995, when, as part of the discovery in this case, he received a copy of the January 1989 Board Resolution which caused him to believe that other SmithKline corporate staff employees were treated differently from Plaintiff in the administration of the VRIF program when they were informed of its 24 month extension. However, Plaintiff has not identified any injury which he first discovered in 1995. The only thing that Plaintiff claims to have discovered is the purported evidence of his claim of discrimination, *i.e.*, the January 1989 Board minutes. The *injuries* Plaintiff is claiming in this suit are (1) the fact that he did not receive certain stock options and (2) the fact that he is no longer employed by SmithKline. Plaintiff does not dispute that he knew of those facts much more than 300 days before he filed his administrative charges.

Moreover, it is undisputed that SmithKline communicated the substance of the January 1989 board resolution to all corporate staff on April 6, 1989, in a memorandum which Plaintiff testified he "should be seen." *See* Jordan

---

**11.** 42 U.S.C. § 2000e–5(e) states in the pertinent part:

> A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred ... except that in a case of unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred....

**12.** A plaintiff may also employ equitable tolling to extend this deadline. Equitable tolling func-

tions to stop the statute of limitations from running where the claim's accrual date has already passed. *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1387 (3d Cir.1994). Equitable tolling is appropriate in three principle although not exclusive situations: (1) where the defendant has actively misled the plaintiff respecting the plaintiff's cause of action; (2) where the plaintiff in some extraordinary way has been prevented from asserting his or her rights; or (3) where the plaintiff has asserted his or her rights mistakenly in the wrong forum. *Id.* (citations omitted). As Plaintiff does not assert that SmithKline engaged in any of the above delay tactics, I will not apply the equitable tolling doctrine in this case.

Dep. at 347–48; SmithKline's Motion at Ex. A–11, (April 6, 1989 Memorandum); Ex. A, ¶¶ 10–11; Ex. B, ¶¶ 6–7; Ex. C, ¶ 4. Even if Plaintiff did not, in fact, see the April 6, 1989 memo, he cannot dispute that if he had exercised the reasonable diligence required by the discovery rule he *should have* seen it when it was circulated to all corporate staff.

Finally, as a general matter, it is clear from Plaintiff's own correspondence that Plaintiff cannot possibly claim that a race discrimination suit never entered his mind before 1995. In Plaintiff's letters to Smith-Kline in May and June 1992, he complained about race discrimination at SmithKline and the alleged "special, private arrangements" whereby executives purportedly received more favorable treatment in the administration of the VRIF program.[13] *See* Smith-Kline's Motion at Exs. A–14 and A–15. Yet he did not pursue such claims for several years after he wrote those letters.

Plaintiff's second and related basis for his race discrimination claims, his alleged constructive discharge, is also untimely for the same reasons set forth above. The discovery rule cannot toll the time limit for filing a charge because the Plaintiff's purported injury (discharge) occurred with his full knowledge by July 1989, when he resigned from SmithKline. *See Oshiver*, 38 F.3d at 1386.

■ Plaintiff's additional race discrimination claims in Count V (under 42 U.S.C. § 1981) and Count VI (under the Pennsylvania Human Relations Act) fail as well. The statute of limitations under 42 U.S.C. § 1981 in federal court in Pennsylvania is two years from the date of the alleged discrimination. *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 662, 107 S.Ct. 2617, 2621–22, 96 L.Ed.2d 572 (1987). Plaintiff did not assert a § 1981 claim until 1995, over six years after the alleged discrimination and after Plaintiff knew or should have known of the substance

of the board resolution. Therefore, his § 1981 claim is barred by the statute of limitations, as well.

■ The time limit for filing a charge under the Pennsylvania Human Relations Act ("PHRA") is 180 days after the occurrence of the alleged unlawful employment practice. *Oshiver*, 38 F.3d at 1385. Plaintiff did not file a charge with the PHRC within 180 days of the alleged employment practice or within 180 days of the date he knew or should have known of the substance of the Board Resolution. As such, the PHRA claim in Count VI is also time-barred.

### b. Merits

Even though Plaintiff's race discrimination claims are untimely, I will address his substantive arguments.

■ Plaintiff's race discrimination claims are based on Plaintiff's allegations that SmithKline purposely did not inform him of the Board's January 1989 resolution because of his race. Plaintiff contends that he has established his prima facie case because (1) he is black, (2) his job qualifications were undisputed, (3) he was treated less favorably than white employees and (4) others similarly situated were not subject to the same adverse action. In response, SmithKline asserts that it did not treat white employees more favorably than black and that it informed all corporate staff of the January 1989 resolution when it circulated the April 6, 1989 memorandum.

■ When the defendant offers a legitimate reason for its employment action, the plaintiff generally must submit evidence which: (1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably concluded that each reason was a fabrication

---

13. Specifically, on May 11, 1992, Plaintiff claimed that:

Not to receive this value due would constitute a double economic impact for me. It is an obvious fact that African Americans (and in many instances, women) have not received anything approaching the level of advancement and income for equal service, time and contribution.

SmithKline's Motion at Ex. A–14.

Plaintiff also stated that there was a "blatant case" for race discrimination should one be interested and that the "implications of race ... discrimination" were his "motivating force" because "the structural bias permeates all levels." SmithKline's Motion at Ex. A–15.

or (2) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action. *Fuentes v. Perskie,* 32 F.3d 759, 762 (3d Cir.1994).

In this case, the only evidence that Plaintiff has provided to support his claim that SmithKline only informed white employees of the substance of the January 1989 board resolution is the Affidavit of Matthew D. Clayton, Esq., a former SmithKline employee. *See* Plaintiff's Motion in Opposition to Defendant's Motion for Summary Judgment ("Plaintiff's Motion") at Ex. B. This employee, who states that he did not receive the April 6, 1989 memorandum, also avers that his employment with SmithKline terminated in February 1989. *Id.* Since he was not employed at the company when SmithKline issued this memorandum, it is not surprising that he did not receive it. As such, his testimony is irrelevant.

On the contrary, one of the employees, who specifically recalls receiving the April 1989 memorandum, is African American. *See* SmithKline's Motion at Ex. C, ¶¶ 4–5. Even more compelling is the fact that Plaintiff himself does not even deny that the information set forth in the memorandum was sent to all corporate staff.[14]

 Plaintiff's related claim of constructive discharge fails as well. Constructive discharge may exist where an employer knowingly permitted conditions of such intolerable discrimination that a reasonable person would feel compelled to resign. *Spangle v. Valley Forge Sewer Auth.,* 839 F.2d 171, 173 (3d Cir.1988); *Gray v. York Newspapers, Inc.,* 957 F.2d 1070, 1079 (3d Cir.1992). However, an employee can still maintain a constructive discharge claim even if an employer treats him or her in a "civil, business-like, gentlemanly fashion;" verbal or physical harassment is not a necessary element. *EEOC v. Hay Assocs.,* 545 F.Supp. 1064, 1087 (E.D.Pa.1982).

Here, Plaintiff argues that the fact that SmithKline allegedly kept certain information from him created an intolerable workplace. Yet, he has only testified that he had "great affection" for the company and that he wanted to continue his work. Jordan Dep. at 136, 138, 414, 416. In light of these comments and the fact that Plaintiff does not assert that his working conditions were unpleasant or difficult but merely that SmithKline kept information from him, I will dismiss Plaintiff's constructive discharge claim, as well.

 Finally, Plaintiff's claim under 42 U.S.C. § 1981 (Count V) is also meritless for all the above reasons and because Plaintiff has not alleged discrimination prohibited by § 1981. The Civil Rights Act of 1991 amendments to § 1981 are not applicable to conduct which occurred before November 21, 1991. *Rivers v. Roadway Exp., Inc.,* 511 U.S. 298, 301–03, 114 S.Ct. 1510, 1514, 128 L.Ed.2d 274 (1994). Claims previous to this date are governed by *Patterson v. McLean Credit Union,* 491 U.S. 164, 185–86, 109 S.Ct. 2363, 2377–78, 105 L.Ed.2d 132 (1989). Under *Patterson,* § 1981 only applies to claims based on certain hiring or promotion decisions. *Id.* As Plaintiff has not alleged a hiring or promotion claim, I will grant summary judgment for SmithKline.

### 5. Remaining State Law Claims

In Count III of the Amended Complaint, Plaintiff states a cause of action for the breach of the covenant of good faith and fair dealing based on SmithKline's alleged failure to provide Plaintiff with notice of the January 25, 1989 board resolution and to otherwise ensure that "all information was available to him" during the course of the negotiations leading up to the signing of Plaintiff's general release on December 8, 1988. Amended Complaint at ¶¶ 31–32; Jordan Dep. at 391. In Count VII, Plaintiff asserts a claim of misrepresentation based on the same alleged failure to provide information. Amended Complaint at ¶ 44. I will grant summary judgment for SmithKline on these Counts, as well.

---

14. Plaintiff testified that he had no reason to believe that this document did not go to all corporate staff employees and he specifically stated that "[o]ften times the policy was to or procedure, I should say, was posted on the Board, it may have been posted or it may have gone out, but if someone said they did either one, I would accept that." Jordan Dep. 347

### a. Statute of Limitations

 A claim for breach of good faith and fair dealing should be treated as a breach of contract claim. *Engstrom v. John Nuveen & Co., Inc.,* 668 F.Supp. 953, 958 (E.D.Pa.1987) (claim purporting to be based on a breach of good faith and fair dealing in an at-will employment relationship is analyzed as a breach of contract claim). The statute of limitations governing a breach of contract claim is four years. *See* 42 Pa. C.S.A. § 5525. Count III is therefore time-barred, since the alleged breach occurred prior to December 8, 1988, but Plaintiff did not assert the claim in Count III until he filed his Amended Complaint in December 1995, seven years later.

 Count VII, is governed by the two year statute of limitations for negligence. *See* 42 Pa.C.S.A. § 5524; *AAMCO Transmissions, Inc. v. Harris,* 759 F.Supp. 1141, 1144 (E.D.Pa.1991). Since the alleged negligence occurred in 1988, this claim is also untimely. Moreover, even if the "discovery rule" applied, this claim would be untimely because Plaintiff is aware, or should have been aware of the existence of the board resolution by April 6, 1989, when SmithKline distributed the memorandum describing the substance of the resolution.

### b. Merits

 Plaintiff bases his allegations in Count III on SmithKline's alleged failure to provide Plaintiff with notice of the January 25, 1989 board resolution. In order to state a claim for breach of good faith and fair dealing, a party must plead facts which would give rise to a contractual obligation to provide information, such as offer, acceptance or consideration. *See Engstrom,* 668 F.Supp. at 957–58; *Garvey v. National Grange Mut. Ins. Co.,* 1995 WL 461228, at *1 (E.D.Pa. Aug.2, 1995) (duty to act in good faith and deal fairly arises from the contract itself).

In this case, SmithKline had no obligation to inform its employees of future plans or resolutions of its Board of Directors. Moreover, it did take these measures by posting the April 6, 1989 memorandum.

 In order to state a claim for negligent misrepresentation, the plaintiff must allege a misrepresentation of material fact, among other elements. *Gibbs v. Ernst,* 538 Pa. 193, 647 A.2d 882, 890 (1994). In Count VII, Plaintiff has alleged nothing more than a "non-communication" of information. Therefore he has failed to allege an essential element of his claim. Additionally, the information that Plaintiff claims that SmithKline concealed from him was published in the April 6, 1989 memorandum.

## IV. COUNTERCLAIM

Based on the foregoing analysis, it is clear that plaintiff violated the terms and conditions of the release by breaching the covenant not to sue the defendant. The issue of damages cannot be resolved by the present summary judgment motion.

## V. CONCLUSION

For the above reasons, SmithKline's Motion for Summary Judgment is granted in its entirety.