G. C. S., INC. and I. S. C. Inc.,
Plaintiffs,

v.

FOSTER WHEELER CORPORATION,
Defendant.

FOSTER WHEELER CORPORATION,
Plaintiff,

v.

G. C. S., INC. and I. S. C. Inc.,
Defendants.

Civ. A. Nos. 94–71 Erie, 4–72 Erie.

United States District Court,
W. D. Pennsylvania.

May 19, 1975.

See also, D.C., 437 F.Supp. 764.

Kirkpatrick, Lochart, Johnson & Hutchison, Pittsburg, Pa., for G.C.S., Inc.

Jeffrey A. Peck, A. Dennis Terrell, Newark, N. J., for Foster Wheeler Corp.

## MEMORANDUM OPINION

WEBER, Chief Judge.

These are cross-suits between a prime contractor and its sub-contractor over damages for delay in completion. We have a motion for partial Summary Judgment filed by the prime contractor, Foster-Wheeler, on certain of the claims asserted by the sub-contractor, G.C.S. Inc. in its complaint and in its counterclaim to Foster-Wheeler's suit.

We have previously considered a motion for summary judgment by Foster-Wheeler on its "no damages for delay" clause of its contract. We found that issue not appropriate for disposition by summary judgment at that time.

The matter has proceeded through voluminous discovery and pre-trial statements to a point where we can determine the evidentiary basis for the delay damage claims sufficiently to consider them with

respect to partial summary judgment to define and narrow the fact issues that can be presented at trial. We have pressed G.C.S. Inc. to supply at the pretrial the evidentiary basis by which its loss and damage can be established by reason of its claims that damages were caused by change orders, extra work and drawing revisions.

The contract between the parties contains the following provisions with respect to change orders, extra work and revisions: *

Foster Wheeler Purchase Order.

Terms and Conditions . . ..

"2. CHANGES: Purchaser shall have the right from time to time by written notice, without notice to Seller's sureties, to make changes in or additions to the instructions, drawings, or specifications for the items to be supplied under this Order and Seller agrees to comply with such change notices which shall become a part of the contract. If such changes cause an increase or decrease in the cost of or time required for performance, an equitable adjustment in the price and delivery schedule shall be made."

Through interrogatories, depositions and documentary discovery it has been established that in all cases where GCS performed extra work under contract changes GCS agreed to all changes and was compensated for such extra work in accordance with the provisions of the agreement. Although the above quoted provision of the contract allowed GCS to request additional time to complete its work by reason of any change order the evidence shows that at no time did GCS ask for such additional time. Actually, one item of extra work was performed by GCS prior to the execution of the Purchase Order and prior to the date of commencement of the contract work, this being the excavation and site-preparation work for the north end of the refinery project.

The Purchase Order provided the method for the authorization of changes and extra work and the compensation to be paid therefor:

* Whether New Jersey law applies, as provided in the contract, or Pennsylvania law, the place of performance, is immaterial because we have

PURCHASE ORDER.

"Sec. 4 B PART ONE (PHASE "B") BUILDING.
·  ·  ·  ·  ·  ·

FOR PART ONE (PHASE "B" ONLY) THE FOLLOWING SHALL APPLY FOR AUTHORIZED EXTRA WORK.

|   |   |   |
|---|---|---|
| a) | Materials | Cost plus 10% |
| b) | Subcontracts | Cost plus 10% |
| c) | Labor (Burdens included) | Cost plus 15% Plus 10% |
| d) | Equipment (Company Owned) | A.E.D. Less 10% |
| e) | Equipment (Rented) | Cost plus 10% |

*  *  *

C. PART TWO – "UNDERGROUND PIPING"
·  ·  ·  ·  ·  ·  ·

d) For authorized extra work not covered by Units Costs, the following Cost Plus Formula shall apply:

1. Materials Cost Plus 10%
2. Labor (Burdens Included) Cost Plus 15% Plus 10%

*  *  *

Sec. 7. EXTRA WORK AND/OR DELETED WORK

a) No field Extra Work (above original scope) shall be performed without authorization in writing by "PURCHASER'S" Representative.

b) Reimbursement For: (See Item 11d)

1. Authorized Field Extra Work. (Item 7a).
2. Extra Work, and/or Credits for Deleted Work due to revisions to drawings previously transmitted to "SELLER" shall be in accordance with quoted Unit Costs.

*  *  *

Sec. 11. TERMS OF PAYMENT & INSTRUCTIONS.
·  ·  ·

d) Extra and/or Credits (if any) must first be:

1. Authorized by change to subject order.
2. Properly included on Form 282, (after receipt of proper change order), before submitted to "PURCHASER'S" Field Representative."

*  *  *

That the subcontractor's delay and the consequences thereof were within the contemplation of the parties is also evidenced by the terms of the Purchase Order:

5. GENERAL

(d)

1. Further, installed Unit Costs shall remain FIRM if "SELLER" is released to commence work before April 1, 1970 and is not delayed by "PURCHASER" or Pennzoil United beyond the date of June 30, 1970 for substantial completion, and July 15, 1970 for final completion and cleanup.

2. In the event that "SELLER" is delayed beyond the above dates by either "PURCHASER" or Pennzoil United, the

found no substantial difference between them, and we have considered the cases from both jurisdictions.

labor portion of "SELLER'S" costs may be subject to escalation due to renegotiated labor contracts. In this event, "SELLER" will invoice "PURCHASER" his out-of-pocket labor costs, which shall consist of actual increase in base pay, plus applicable insurance and payroll taxes and any additions to fringe packages. The foregoing applies to direct labor only.

Material costs shall be firm and not subject to escalation.

The above extracts from the Purchase Order are recited to make clear that all items of extra work were contemplated by the parties and were the subject of negotiations between the parties and prior to the performance of any extra work or changes or revisions.

In addition to the contract provisions governing the extra work, the testimony of Mr. Christensen and Mr. Grey on deposition clearly establishes that GCS expected to be requested to perform extra work on the job and that the contract made provision for such extra work and the method of payment for such work.

There is no claim here that GCS was not paid for any extra work called for by contract changes or drawing revisions.

While GCS does not dispute this fact it contends that not all of the extra work was contemplated by the parties at the time the contract was entered into, and that certain of the items were of such magnitude and occurred sufficiently late on the job as not to be within the contemplation of the parties. Further, GCS contends that the change orders, extra work and drawing revisions were of such a scope as to amount to active interference by Foster-Wheeler on the job which therefore entitled GCS to damages for delay despite the inclusion of a clause in the contract barring any claim for damages for delay.

In our review the most compelling evidence against GCS's claim is the Purchase Order provision recited above page 2:

"2. CHANGES:

"If such changes cause an increase or decrease in the cost of *or time required for performance,* an equitable adjustment in the price and *delivery schedule* shall be made." (emphasis supplied)

GCS secured its adjustments for costs, but it is not shown that it ever requested time extension. It becomes apparent that the parties contemplated that changes and revisions could prolong the time required for performance and the parties provided for that in the contract.

That GCS voluntarily assumed extra work not as a result of a change order, but by way of a separate contract in which all of the terms and conditions were negotiated is illustrated by the exchange of telegram of March 23, 1970 (Motion Ex. G) and letter of April 2, 1970 (Motion Ex. H) in which the entire terms of the performance and the compensation for the excavation of the hydrotreating area are set forth. This was work which requested by GCS and was assigned to them so that they could take advantage of their presence on the job site (see Gray deposition, Motion Ex. J., p. 59) and the agreement was concluded before the principal contract was signed. Work began on this extra project before the commencement date of work on the principal contract.

Other such extra work was work done outside the limits of the work described in the area covered by the Purchase Order and could not have interfered with the progress of the Purchase Order Contract Work.

That GCS was willing to accept extra work at all times during its presence on the job site is proven by the testimony of Mr. Christensen (Motion Ex. E, p. 115) that GCS was at the job site, they were in the construction business, they were looking for work and took what was offered, even on short notice. (See also Gray deposition, pp. 88–89).

That GCS could and did refuse extra work not within the scope of the purchase order is established by the testimony of Mr. Gray. (Gray deposition, p. 92 and p. 353).

We, therefore, find that all of the extra work outside the scope of the original contract was separately negotiated and agreed to by GCS and was compensated in accordance with the agreements made, and in none of these agreements did GCS secure an enlargement of time for the performance of its principal contract.

GCS argues that although it voluntarily undertook the extra work of site preparation and was compensated on a unit price basis for such work, it has never been compensated for the effect which the site preparation work had on GCS's ninety day schedule for completion of its contract work. A similar argument is posed with respect to other work, either "extra" work outside the scope of the original Purchase Order, or change orders covering Purchase Order Work. GCS bases its claim for damages on the assertion:

> "The additional work represented by the foregoing change orders had the effect of delaying GCS's work under its purchase order because the work required GCS to divert manpower from its purchase order work, as well as the attention of its field supervisors and home office personnel." (GCS's Answer to Foster-Wheeler's Third Set of Interrogatories No. 3(d)).

There were fifteen (15) change orders, covering all extra work, whether within the scope of the purchase order, or work not contemplated by the purchase order. GCS lists twelve (12) of them as contributing to its claim of delay damage. (GCS's Answer to Foster-Wheeler's Third Set of Interrogatories, list attached to Answers 3(a)(b) and (c)).

CONSTRUCTION DRAWINGS

A third element of delay damages claimed by GCS is that caused by revised contract drawings and delay in receipt of these.

As a result of a motion of Foster-Wheeler to compel more responsive answers to certain interrogatories and our order of September 20, 1974, GCS gave further information with respect to the change orders and the revised construction drawings. With respect to the construction drawings GCS submitted a three page list specifying twenty-eight (28) revisions, setting forth the date scheduled for delivery, the date of receipt of a useable drawing, the number of days late, and the nature and effect of delay to progress. This list narrows down the original list of approximately 180 draw-ing revisions claimed to be late in GCS's original answers to Foster-Wheeler's Third Set of Interrogatories, Nos. 1 and 2.

The effect of these drawings as alleged by GCS was to cause a delay in the commencement of a particular item of work. This list does not include all drawing revisions on this job, or all that were received later than scheduled. GCS asserts that the other drawing revisions not listed in the supplemental answers had no direct or immediate effect on GCS's job.

While the nature and effect of the delay are set forth, the causal relation between any single item and any particular damages suffered is not set forth. As was argued at length in the motion for more responsive answers, GCS can submit no specific instance where it was caused to lose money by delay in receipt of drawings by reason of enforced idleness of men and equipment who could not proceed with other work on the project while awaiting the revised drawings.

While Foster-Wheeler has alleged that the drawing changes only involved 2.3% of the work, this is not established as an undisputed fact. We do not know if the percentage quoted applies to the whole contract, or only to the drawing which required changes as compared to those requiring no change.

GCS admits that it cannot support its claim for damages for delay on any particular item, or on any total of particular items, but rather relies upon the cumulative effect of the various late drawings which "caused a loss of momentum and interference with its work plan or sequence which substantially expanded the time within which GCS could reasonably expect to complete its work."

Nowhere in the supplemental answers to the interrogatories does GCS set forth the causal relation between the delayed receipt of drawings and the fact of damages; it is not shown in any specific instance that men, machinery or equipment were made idle, at GCS's cost, pending the receipt of any delayed drawings.

While Foster-Wheeler argues that many of the drawings claimed to be late were actually delivered on time, and that some were duplicates of drawings delivered earlier or detail enlargements of earlier drawings, we have no evidence before us on these facts, and if they are material, we cannot dispose of the matter by summary judgment.

GCS admits that it cannot offer evidence of the precise number of days delay or dollars of harm caused by each particular late drawing, change order or hold order. At no time was all work of GCS suspended because of these. It is the argument of GCS that the cumulative effect of these caused a loss of motion and interference with its work plan or sequence which substantially extended the time within which it could reasonably be expected to complete its work. A part of this delay was caused by its voluntary acceptance of extra work. Another part was due to change orders and revised drawings, which it was contractually bound to accept, with provision for additional pay for extra work, which it received, and provisions for allowance of extra time, which was never invoked.

In addition to the provisions of Par. 2 of the *Terms and Conditions* recited above giving Purchaser (Foster Wheeler) the right "to make changes in or additions to the instructions, *drawings* . . . etc.", Sec. 2(d) of the Purchase Order, "Documents" recites

(d) "All construction drawings, and or revisions to same or added drawings, etc. will be handed to you at the job site by the *PURCHASER'S* Project Superintendent. These will then be incorporated in subject order by a formal change order."

Sec. 4 of the Purchase Order "Applicable Contract Unit Costs" ends with notice

"*IMPORTANT*

Where construction drawings introduce new items, 'SELLER' shall supply 'PURCHASER' immediately with appropriate installed Unit Cost/Item."

"PURCHASER will then issue a change to subject purchase order to incorporate said item."

and in Sec. 7, EXTRA WORK AND DELETED WORK the Purchase Order again recites:

"2. Extra Work and/or Credits for Deleted Work due to revisions to drawings previously transmitted to 'SELLER' shall be in accord with quoted unit costs."

We conclude, therefore that the changes and revisions in drawings at issue here were within the contemplation of the parties at the time they entered into the contract; they were provided for by the contract; and they were related to the provisions for change orders and extra work under which the sub-contractor was paid for the additional labor and materials required in accordance with the unit prices agreed to in the base contract, which also provided for required extensions of time.

An example of the handling of extra work is shown by Motion Ex. K., a letter dated March 5, 1970 by the Vice-President of GCS, Robert A. Gray confirming the price terms of the contract, the dates of commencement and completion, and acknowledge receipt of drawings requiring additional work, and quoting the price for such additional work.

In *McDaniel v. Ashton-Mardian Co.,* 357 F.2d 511 [9th Cir. 1966], a Miller Act case, a subcontractor brought an action for damages against the prime contractor for delays caused by the voluntary assumption of extra work by the prime contractor. The contract between the government and the prime contractor, which also became part of the contract between the prime contractor and subcontractor, allowed for changes in the specifications within the general scope of the contract. The subcontract recognized within its own provisions that changes and additions might delay the work. A delay did occur, due partly to changes made by the government and partly to other factors. The court found that summary judgment in favor of the prime contractor was appropriate. In its tort claim, the subcontractor maintained that the prime contractor committed a wrongful act in accepting the change orders, which caused the delay. However, the court pointed out that the

prime contractor was contractually bound to accept these changes. With regard to the contract claim, the court found that the parties did not intend their subcontract to mean that the subcontractor could recover damages from the prime contractor for delays occasioned by proper change orders of the government.

While the Court in *Mardian* noted the exception created by *United States v. Rice,* 317 U.S. 61, 63 S.Ct. 120, 87 L.Ed. 53 [1942] that while the owner's right under the contract to change specifications gave rise to no cause of action, a "cardinal change" outside the scope might do so except for the fact that in accepting a change order, which he is not obliged to accept, a contractor is estopped from claiming that it was beyond the scope.

GCS has alleged that despite the provisions for revisions and change orders in the contract and despite the fact that such change orders were accepted and performed by it, they are still entitled to damages because the number, variety, and effect of all of the change orders in this case constitute active or deliberate interference with their performance of the contract. In response to Foster Wheeler's Supplemental Interrogatories and in response to the motion of Foster Wheeler for summary judgment, GCS has come forward with no showing that there is any evidence to create a genuine issue of material fact as to active or deliberate interference on the part of Foster Wheeler. It appears that this situation is very similar to that which prevailed in *Lichter v. Mellon-Stuart Company,* 196 F.Supp. 149 [W.D.Pa.1961]; *aff'd,* 305 F.2d 216 [3rd Cir. 1962] where the trial judge found:

> "With various contingencies plaguing the construction project,. and which continued to plague it, it seems to me that the contractor defendant (Mellon), in ordering plaintiffs (Southern) to proceed, was not being fraudulent, capricious, arbitrary, or acting in bad faith, but was merely exercising its judgment in directing and coordinating the work as required by its progress, which is a right

and duty given to it by the express terms of the contract." (196 F.Supp. at 151).

■ While GCS argues that *Lichter v. Mellon-Stuart Company,* was decided after a plenary trial when the judge had so determined, and not by summary judgment as is sought here, nevertheless it is incumbent upon the respondent in a motion for summary judgment to come forward with some admissible evidence to show that there is a genuine issue of material fact. If he does not do so it is appropriate under Fed.R. Civ.P. 56 that judgment be rendered against him. In a case from the state courts of New Jersey cited by both parties in their briefs presenting a very similar factual situation the court noted:

> "Bare conclusions in pleadings, without factual support in tendered affidavits, will not defeat a meritorious application for summary judgment." *A. Kaplen & Son, Ltd. v. Housing Authority,* 42 N.J. Super. 230, 126 A.2d 13, 16 [1956].

In all of the extensive materials produced by discovery and in answer to the motion for summary judgment there is no evidentiary material showing whether the change orders, the extra work or drawing revisions supplied by Foster Wheeler were fraudulent, capricious, arbitrary, or done in bad faith, the requirements for proof of active interference with the performance of the contract established in *Lichter v. Mellon-Stuart Company,* supra.

We recognize that the court in *Lichter v. Mellon-Stuart* did find liability against the contractor for one element of delay damages. It was found that the contractor had not made the shelf-angles level for installation of stone by the sub-contractor, and, after timely warning failed to set and adjust them. The court found that these negligent omissions substantially interfered with and hindered plaintiff's normal performance schedule for which he was entitled to damages if a reasonable basis for their calculation could be found. The court did find a reasonable basis for apportioning the damages due to this allowable item of recovery from the rest of the claimed damages which were denied.

We recognize that inability to establish the precise damages should not bar recovery if plaintiff can establish a reasonable basis for allocating them. *Peter Kiewit Sons' Co. v. United States,* 151 F.Supp. 726, 138 Ct.Cl. 668 [1957]; *Chalender v. United States,* 119 F.Supp. 186, 127 Ct.Cl. 557 [1954]. But before this is allowed, the claimant must first establish that the defendant was legally liable for such damages. In *Chalender,* supra, the court found the government at fault for part of the delays because of its failure to deliver materials on time. The government both failed to deliver the required materials on time, but failed to place purchase orders with suppliers so as to permit timely deliveries. These failures resulted in actual work stoppage by the plaintiff. In such case the court found a reasonable basis to apportion damages between those where the government was at fault and where it was not.

Similarly, in *Peter Kiewit Sons' Co.,* supra, the court was able to apportion damages and award damages against the government for that part of the delay caused by its own negligence and wilful misconduct.

But where there is no evidence that Foster-Wheeler was guilty of breach of good faith or active interference with the performance of GCS, the contract terms prevail, the purchase order clause of APPENDIX B. 5 comes into play:

"5. Delays. Neither Purchaser nor its customer shall be liable to Seller for additional expense or damages, direct, indirect, consequential or otherwise caused by or arising out of delays or Seller's inability to proceed with the work, however caused."

While we initially denied summary judgment on the "no damages delay" clause because of the allegation by GCS of active interference it now appears that after full development of the evidence in response to Foster-Wheeler's pending motion, no evidence has been produced of affirmative or positive interference that would survive the "no damages for delay clause". GCS has the burden on summary judgment of showing the existence of such evidence and none has been produced.

I conclude:

1) That GCS voluntarily accepted extra work that is the basis of a claim for delay damages.

2) That GCS was contractually obligated to accept and perform change orders which would result from revised drawings.

3) That all change orders provided for compensation for additional costs incurred according to the contract schedule.

4) That GCS was paid for all extra work and change orders according to the agreement of the parties.

5) That all revised drawings and resultant change orders provided for extensions of time if needed.

6) No extensions of time were ever requested.

7) There has been no showing that the delay in completion of the entire job was due to any item of extra work, revised drawing, late drawing or change order.

8) There is no showing of evidence of active interference, arbitrary, capricious or bad faith action on the part of Foster-Wheeler to interfere with GCS's performance.

The trial of the remaining questions at issue in this action shall be governed by the above findings, and no evidence on the above matters will be admitted in support of GCS's claim for delay damages.