**ILM SYSTEMS, INC.,**

v.

**SUFFOLK CONSTRUCTION CO., INC.**

No. 00–CV–4531.

United States District Court,
E.D. Pennsylvania.

Aug. 1, 2002.

Shawn R. Farrell, Cohen, Seglias, Pallas & Greenhall, Philadelphia, PA, for plaintiff.

Edward I. Swichar, Blank, Rome, Comisky & McCauley LLP, Mark L. Rhoades, Blank, Rome, Comisky & McCauley, Philadelphia, PA, David A. Dorey, Blank, Rome, Comisky & McCauley LLP, Cherry Hill, NJ, for defendant.

### MEMORANDUM & ORDER

SURRICK, District Judge.

The instant matter involves a construction claim by a drywall subcontractor, Plaintiff ILM Systems, Inc. ("ILM"), against a general contractor, Defendant Suffolk Construction Co., Inc. ("Suffolk"), for work ILM performed for Suffolk. ILM has brought this diversity action against Suffolk for breach of contract, unjust enrichment and breach of Pennsylvania's Contractor/Subcontractor Payment Act, 73 Pa.C.S.A. Ch. 14(A) § 501, et seq. (the "PCSPA"). Currently before the Court is Suffolk's Motion for Partial Summary Judgment (the "Motion," Docket No. 12). For the reasons that follow, the Motion is GRANTED in part and DENIED in part. In summary, we grant Suffolk's Motion on ILM's claims for a) damages based on alleged labor overrun ($594,-340.44) and extra material cost ($20,-929.95), b) unjust enrichment, and c) attorneys' fees and interest, except fees and interest based on unpaid change orders.

## I. BACKGROUND

In 1998, CareMatrix Corporation (the "Owner") contracted with Suffolk to renovate a building at Logan Square in Philadelphia, Pennsylvania, and turn it into 135 assisted living units (the "Project"). As the general contractor, Suffolk entered into a subcontract with ILM on March 17, 1998 (the "Subcontract") to perform drywall work on the Project. ILM was re-sponsible for framing the interior rooms and facilities, hanging drywall, taping and spackling, and installing acoustical ceilings. Originally, under the Subcontract, ILM's work was to be completed by July 27, 1998, and ILM was to be paid $1.7 million.

For various reasons, the Project was delayed, and ILM was unable to complete its work until May 1999. Suffolk does not contend that the delays were caused by ILM, but rather contends that they resulted from the Owner dramatically changing the number and configuration of units, which created a multitude of design adjustments and disjointed construction between floors. As a result, Suffolk did not close out the Project until August 1999, several months after the Project was scheduled to have been completed.

ILM maintains that Suffolk was responsible, at least in part, for the delays in the Project. According to ILM, the delays were caused by the following factors: 1) Suffolk providing ILM with drawings that contained dimensional discrepancies, which required re-layout of certain walls; 2) Suffolk inefficiently coordinating the subcontractors on the Project and, thus, failing to maintain a schedule for the timely completion of work; 3) Suffolk changing its Project Manager three times and Project Executive twice during the course of the Project; and 4) Suffolk's failure to approve ILM's change order requests and respond to its requests for information in a timely manner.

As a result of these undisputed delays and the additional work ILM was required to perform, ILM claims it is owed more than $900,000. First, ILM seeks payment of $61,582.51 for work it performed pursuant to unpaid change orders. See Pl. Resp. to Def. First Set of Interrog. No. 4. In addition, ILM contends it suffered de-

lay damages in excess of $800,000, stemming from labor overrun ($594,340.44), lost profit ($170,000), extra cost of material ($20,929.95), and extra supervision ($75,290.56). *Id.*

The manner by which Suffolk was to pay ILM is delineated in the Subcontract, which contains the following key provisions:

*Article 4. Payment*

The Subcontractor Amount shall be payable in monthly progress payments as follows .... **Receipt of progress and/or final payments by the Contractor from the Owner with respect to the Work shall be, in each instance, a condition precedent to the Subcontractor's right to receive his share of any such payment from Contractor.** The Subcontractor's applications for partial payments and final payment ("Requisitions") are to be submitted to the Contractor in the form set forth in one of the exhibits incorporated through Exhibit "A" and in the manner required by the Contractor.... Contractor may require, as a condition precedent to any periodic or final payment that Subcontractor provide executed releases from itself and each of its sub-subcontractors, laborers and material suppliers through the date covered by the most recent partial payment and, with respect to a pending progress payment, releases conditioned on receipt of that progress payment through the date covered by that progress payment....

**Contractor shall not be obligated to make payment to the Subcontractor on any approved Requisition prior to the Contractor's receipt of payment from the Owner in respect of such Requisition....**

[F]inal payment, constituting the entire unpaid balance of the Subcontract Amount, shall be due only when the Subcontractor shall execute and deliver to the Contractor a final release and lien waiver, in form satisfactory to the Contractor, of all claims of the subcontractor against the Owner and Contractor .... The Subcontractor's acceptance of final payment shall constitute full and final settlement of all obligations of the Owner and Contractor to the Subcontractor with respect to this Subcontract.

*Article 6. Extensions*

The Subcontractor agrees that he shall have no claim for money damages or additional compensation for delay no matter how caused, but for any delay or increase in the time required for performance of this Subcontract not due to the fault of the Subcontractor, the Subcontractor shall be entitled only to such extension of time for performance of his Work as shall be allowed to the Contractor by the Owner and/or Architect. **All claims for such extension of time shall be made in the manner and within the time provided for in the General Contract for like claims by the Contractor upon the Owner.**

*Article 8. Subcontract Terms and Conditions.*

8.3 Dependence of Work.

If the Subcontractor determines that any previous work required to be performed under the Contract Documents or any portion of work on which the Subcontractor's Work is dependent is not in accordance with the Contract Documents, the Subcontractor shall, prior to commencing that portion of the Work, promptly notify the Contractor in writing.

8.12 Claims.

The Subcontractor shall not make any claims for additional compensation for

any work performed by the Subcontractor or for damages sustained by the Subcontractor by reason of any act or omission of the Contractor, Owner, or Architect during the performance of this Subcontract **unless such work is done pursuant to, or such damages are sustained as a result of, a written order from the Contractor and such claim is made in the manner set forth in the Contract Documents.** Notice of all such claims (including disputes over the scope of work) shall be given to the Contractor in writing within ten (10) business days (unless a shorter period is specified in the Contract Documents) after the occurrence of the event giving rise to such claim, or the claim shall be considered abandoned by the Subcontractor. Notwithstanding anything to the contrary contained in this Subcontract, **the Subcontractor shall have no claim for additional compensation with respect to alleged changes to the Work** by the Owner, Architect or any of their agents or with respect to interpretation of the Contract Documents or Exhibit B, **except to the extent that the Contractor shall have such claim under the General Contract, and such Contractor's claim and allowance thereof by the Owner shall be a condition precedent to the Subcontractor's claim and allowance thereof by the Contractor** . . . .

Subcontract (emphasis added). The Subcontract also specifies Suffolk's rights and remedies in Article 8, Paragraph 6. With respect to Suffolk's capacity to alter ILM's work, the Subcontract states that Suffolk had the right to make changes in the work pursuant to Paragraph 8.13, which requires that contract revisions, including all changes to the Subcontract and scope of the work, shall be confirmed in a writing signed by the Contractor and Subcontractor. *See* Subcontract, ¶¶ 8.6.1 and 8.13.

The Subcontract states that changes may consist of changes in the scope of the work. Subcontract, ¶ 8.6.1. Of particular importance to ILM's claims, adjustments in the Subcontract Amount paid to the Subcontractor would be determined in the manner set forth in the Contract Documents for reimbursement of Change Orders. *Id.*

As permitted by Article 4 of the Subcontract, Suffolk required ILM to execute a form release attached as Exhibit D to the Subcontract. The form provides:

In consideration of the receipt of the amount of payment set forth above and any and all past payments from contractor in connection with the project, undersigned acknowledges and agrees that it has been paid all sums due for all labor, materials and/or equipment furnished by the undersigned to or in connection with the project and the undersigned hereby releases, discharges, relinquishes and waives any and all claims suits, liens and rights . . . against Suffolk on account of any labor, materials and/or equipment furnished through the date hereof.

*Id.,* Ex. D. ILM, through its President, Charles Rogers, signed the release on several occasions during the Project, with the latter two releases dated March 16, 1999 and June 16, 1999. The June 16, 1999 release came one month after ILM retained its current attorney in May 1999, *see* Rogers Mar. 26, 2001 Dep. at 147, and after ILM's work on the Project was completed. *See* Aug. 16, 1999 letter ("The project has been completed for approximately two months."); Pl. Opp. Brf. at 3 (stating that Project continued for eleven months after July 27, 1998); *id.,* at 4 (admitting that the Project ended in June 1999).

On October 7, 1999, in consideration of a $125,022.24 payment from Suffolk, ILM signed an additional release that differed from the release forms it had signed previously. The October 7, 1999 release states:

The undersigned ("ILM") does hereby release all Mechanic's Liens Rights, Miller Act Claims . . ., Stop Notices, Equitable Liens and Labor and Material Bond Rights resulting from any contract balances or credits owed to ILM for any labor and/or materials, subcontract work, equipment or other work, rents, services or supplies heretofore furnished in and for the construction, design, improvement, alteration, additions to or repair of the above described project, pursuant to the [Subcontract]. Notwithstanding anything to the contrary, the Parties specifically acknowledge that ILM does not release any legal or equitable remedy available to it which arise out of the any [sic] and all claims identified on the attached Exhibit "A".

Release dated October 7, 1999. Exhibit A, attached to the October 7, 1999 release states: ILM and [Suffolk] hereby specifically agree that ILM does not waive any equitable or legal remedy which it may have with respect to the following disputed items:

1. Any and all claims which may rise out of Change Order Nos. 25, 26, 28, 30 . . ., 32, and 33;

2. Changes made on the first floor of the Project, in the amount of $9,715.90;

3. Extra work performed by ILM on the access panel on the Project, in the amount of $5,862.05;

4. Extra work performed by ILM as a result of additional doors on the Project, in the amount of $1,482.00; and

5. Delay damages of ILM due to Suffolk's failure to properly coordinate trades on the Project, including, but not limited to, stacking of trades, multiple or larger crews, higher material costs, added supervision costs and added overhead costs.

*Id.,* Ex. A.

## II. NATURE AND STAGE OF PROCEEDING

ILM commenced this action against Suffolk on August 11, 2000 by filing its Complaint in the Philadelphia County Court of Common Pleas. Based on diversity jurisdiction, Suffolk subsequently removed the action to this Court. The Complaint states three separate causes of action: breach of contract (Count I); unjust enrichment (Count II); and breach of Pennsylvania's Contractor and Subcontractor Payment Act (Count III).

Suffolk has moved for partial summary judgment. With respect to Count I, Suffolk argues: a) the Subcontract bars all monetary compensation for delay damages no matter how the delay was caused, b) the lien waiver and releases permitted by the Subcontract and executed by ILM bar any of ILM's claims that accrued through the execution of each release, and c) ILM's claims are either barred or significantly limited by ILM's failure to comply with the Subcontract's notice provisions. With respect to Count II, Suffolk has moved for summary judgment, arguing that the existence of the Subcontract precludes ILM's claim for unjust enrichment. Finally, Suffolk has moved to dismiss Count III, arguing that the PCSPA applies only to regular progress payments, and not to delay damages or change orders.

## III. STANDARD

"Summary judgment is properly granted if 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Rule 56(c), Federal Rules of Civil Procedure). If the moving party meets the initial burden of showing that there is no genuine issue of material fact, the burden shifts to the non-moving party to set forth specific facts showing the existence of such an issue for trial. *Shields v. Zuccarini,* 254 F.3d 476, 481 (3d Cir.2001) (citing Rule 56(e), Federal Rules of Civil Procedure). In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment must be granted if the party responding to the motion fails "to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548.

## IV. DISCUSSION

**A.** *Evidence of Interference by Suffolk Prevents Summary Judgment Based on the "No Damages for Delay" Clause.*

 Suffolk first points to Article 6 of the Subcontract as grounds for partial summary judgment. In response, ILM argues that Suffolk interfered with, and failed to act in a manner necessary to, the undertaking of ILM's work. Under Pennsylvania law, an exculpatory clause such as Article 6 does not bar claims by a subcontractor for delays that are caused by interference or material omissions of a general contractor. *See Allied Fire & Safety Equipment Co. v. Dick Enterprises, Inc.,* 886 F.Supp. 491 (E.D.Pa.1995) (subcontract's express provision requiring contrac-

tor to coordinate work was not coextensive with implied duty not to interfere in subcontractor's work, which could result in damages not withstanding "no damages for delay" clause); *G.C.S., Inc. v. Foster Wheeler Corp.,* 437 F.Supp. 757 (W.D.Pa. 1975) (originally denying summary judgment notwithstanding "no damage" clause "however caused," but ruling damages for delay would be governed by terms of contract where subcontractor failed to provide evidence of bad faith or interference by contractor); *Lichter v. Mellon–Stuart Co.,* 193 F.Supp. 216 (W.D.Pa.1961) (prime contractor liable to subcontractor for breach of subcontract as a result of negligence causing delay in subcontractor's work). *See also Fox's Foods, Inc. v. Kmart Corp.,* 870 F.Supp. 599, 606 n. 7 (M.D.Pa.1994) (delays in providing contract drawings were not excusable) *Coatesville Contractors and Engineers, Inc. v. Borough of Ridley Park,* 509 Pa. 553, 506 A.2d 862, 865 (1986) (contractor could recover for damages caused by owner's failure to take necessary acts, as such interference was outside class of difficulties contemplated by "no damage for delay" clause); *Gasparini Excavating Co. v. Pennsylvania Turnpike Commission,* 409 Pa. 465, 187 A.2d 157 (1963); *Henry Shenk Co. v. Erie County,* 319 Pa. 100, 178 A. 662, 664 (1935); *Pennsylvania State Highway and Bridge Authority v. General Asphalt Paving Co.,* 46 Pa.Cmwlth. 114, 405 A.2d 1138 (1979).

ILM has presented evidence that Suffolk interfered with its work by: 1) providing ILM with inaccurate drawings and responding to ILM's request for information and change order requests in an untimely manner; 2) changing project managers three times; and 3) failing to coordinate the other subcontractors. Thus, even if we were to assume that, on its face, Article 6 bars ILM's claims, a genuine issue of

material fact exists regarding whether Suffolk interfered with, or failed to act in a manner necessary to, ILM's prosecution of its work. Summary judgment therefore may not be granted on this ground.

**B.** *The Releases Bar ILM's Claims Based on All Labor, Materials and Equipment.*

■ Suffolk next argues that ILM's claims are barred by the several releases signed by ILM during the Project. "Under Pennsylvania law, general releases are interpreted by the rules of contract construction," *Bickings v. Bethlehem Lukens Plate,* 82 F.Supp.2d 402, 405 (E.D.Pa.2000) (citing *Evans v. Marks,* 421 Pa. 146, 218 A.2d 802 (1966)), and are "binding upon the parties unless executed and procured by fraud, duress, accident or mutual mistake." *Bowersox Truck Sales and Serv., Inc. v. Harco Nat'l Ins. Co.,* 209 F.3d 273, 279 (3d Cir.2000) (interpreting Pennsylvania law). In construing a release, the court's foremost consideration is the intention of the parties. *Bickings,* 82 F.Supp.2d at 405 (citing *Three Rivers Motors Co. v. Ford Motor Co.,* 522 F.2d 885, 892 (3d Cir.1975)). "The intention of the parties is gathered from (1) the language of the release and (2) the circumstances surrounding the execution of the release." *Id.* (citing *Wenger v. Ziegler,* 424 Pa. 268, 226 A.2d 653 (1967)).

■ In interpreting a release, a court should not stretch the language of the release beyond the words agreed upon by the parties. *Bowersox,* 209 F.3d at 279. "Releases are strictly construed 'so as to avoid the ever present possibility that the releasor may be overreaching.'" *Bowersox,* 209 F.3d at 280 (citing *Restifo v. McDonald,* 426 Pa. 5, 230 A.2d 199, 201 (1967)).

"It is the responsibility of the court to determine as a matter of law whether or not the meaning of the contract is ambiguous." *Colt Indus. Inc. v. Aetna Casualty and Surety Co.,* Civ. A. No. 87–4107, 1989 WL 147615, *2 (Kelly, J.) (E.D.Pa.1989). "The court must give full regard to any reasonable alternatives proffered by the parties." *Id.* (citing *Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001, 1011 (3d Cir.1980)). "Clear language, however, must not be tortured in order to create an ambiguity." *Id.* (citing *Treasure Craft Jewelers, Inc. v. Jefferson Ins. Co. of New York,* 583 F.2d 650 (3d Cir.1978)). "[T]he terms of the release will be given their ordinary meaning unless a different meaning was clearly intended." *Bickings,* 82 F.Supp.2d at 405 (citing *Wenger*). Therefore, "a release covers only those matters which may fairly be said to have been within the contemplation of the parties when the release was given," *Bowersox,* 209 F.3d at 279 (citing *Restifo,* 230 A.2d at 201), and "the general words of the release will not be construed so as to bar the enforcement of a claim which has not accrued at the date of release." *Bowersox,* 209 F.3d at 279.

"In addition, the language of the release must be viewed in the context of the entire document. Each part of the release must be given effect. Therefore, terms in one section of the contract should not be interpreted to nullify or conflict with other terms. If one clause appears to conflict with another, the clauses should be construed, if possible, as consistent with one another." *Bickings,* 82 F.Supp.2d at 405–06 (citations omitted).

Courts must also inquire into the circumstances surrounding the execution of the release. *Id.,* at 406 (citing *International Organization Master, Mates and Pilots of America Local No. 2 v. International Organization Masters, Mates and Pilots of America Inc.,* 497 Pa. 102, 439 A.2d 621 (1981)). "The surrounding cir-

cumstances clarify the intention of the parties and identify 'matters which may be fairly said to have been within the contemplation of the parties when the release was given.'" *Id.* (citing *Vaughn v. Didizian*, 436 Pa.Super. 436, 648 A.2d 38 (1994)). Nevertheless, "a party cannot evade the clear language of the release by contending that he did not subjectively intend to release the claim at issue." *Id.* (citing *Jordan v. SmithKline Beecham*, 958 F.Supp. 1012, 1019–20 (E.D.Pa.1997)); *Buttermore v. Aliquippa Hosp.*, 522 Pa. 325, 561 A.2d 733, 735 (1989).

▮ The language of the form releases signed by ILM, through and including the June 16, 1999 release, clearly states that ILM releases and waives all of ILM's claims on account of any labor, materials and/or equipment furnished through the date thereof. Because we find this language to be unambiguous with respect to all claims based on labor, materials and equipment, we need not construe the language against Suffolk, the drafter of the release form. Furthermore, ILM advances no reasonable alternative interpretation of this language. Therefore, ILM's pending claims for damages from labor overrun ($594,340.44) and extra material cost ($20,929.95) are barred.[1]

ILM argues that the Parties never intended to release any delay damages of ILM and that Rogers held conversations and sent written letters to put Suffolk on notice of his intention to pursue such claims. Rogers Dep. of Mar. 26, 2001, at 260. The evidence reveals, however, that the releases were not a mere formality and that consideration was given by Suffolk for ILM's execution of the releases. *See* Pl. Opp. at 29 (arguing that if ILM did not sign the releases, it would not have been paid). The form of the release was attached to the Subcontract at the time of execution on March 17, 1998. *See* Subcontract, Ex. D. ILM cannot overcome its contractual agreement with Suffolk by pointing to conversations and letters demonstrating a subsequent change in ILM's understanding of the release's meaning. *Bickings*, 82 F.Supp.2d at 406 ("[A] party cannot evade the clear language of the release by contending that he did not subjectively intend to release the claim at issue.") (citing *Jordan v. SmithKline Beecham*, 958 F.Supp. 1012, 1019–20 (E.D.Pa. 1997)).

▮ As further evidence of the Parties' understanding of the releases, ILM directs the Court's attention to the release signed by ILM on October 7, 1999. ILM argues that the October 7, 1999 release, by expressly reserving certain ILM claims, demonstrates that neither party intended that ILM had waived its right to seek delay damages. The language of that release, however, cannot be construed as an admission by Suffolk as to the existence of the claims contested in this action. In the October 7, 1999 release, ILM again waived

---

1. ILM contends it sustained other damages in the form of extra supervision, work from change orders and lost profits. Although we are unconvinced that the delay in the Project resulted in damages to ILM other than from having to provide additional labor, materials and equipment, the releases do not explicitly address lost profit, and, therefore, we will not construe them to preclude such a claim. Furthermore, because it is unclear whether the releases were intended to include claims based on change orders, we will permit Plaintiff to demonstrate that it was not compensated for such work in accordance with Paragraph 8.6.1 of the Subcontract, which governs additional compensation for changes in ILM's work. Finally, we note that there is insufficient evidence at this time for the Court to determine whether ILM's claim for extra supervision ($75,290.56) was intended to come within the meaning of "labor" and is thereby released. We anticipate that additional evidence will be presented at trial on these issues.

several categories of claims, but also expressly stated that the execution of the release did not constitute a waiver of any legal or equitable remedy "available to" ILM arising out of certain claims specified in Exhibit A of the release. *See* Release dated Oct. 7, 1999. Exhibit A then states that, by signing the October 7, 1999 release, "ILM does not waive any equitable or legal remedy which it may have with respect to the following disputed items." *Id.*, Ex. A. The release clearly states that claims are "disputed" and, thus, cannot serve to validate any of ILM's claims. Furthermore, by adding an exception which did not exist in any of the prior releases, ILM implicitly acknowledged that the prior releases failed to preserve any portion of the claims explicitly waived by ILM in the earlier releases. Moreover, the October 7, 1999 release is a unilateral document executed by ILM alone. It therefore does not impose any obligations on Suffolk, or create any rights for ILM. In short, the October 7, 1999 release does not *resurrect* any claims previously released by ILM.

Finally, ILM argues that it could not have released any claims that had not yet accrued. We agree that a release will not bar the enforcement of a claim that had not accrued at the date of the release. *Bowersox,* 209 F.3d at 279. In addition, we will not construe a release to bar claims unknown to the parties at the time of execution unless such waiver is explicitly provided in the release. *Id.; Bickings,* 82 F.Supp.2d at 406; *Jordan,* 958 F.Supp. at 1020. Nevertheless, the evidence here demonstrates that ILM completed its work on the Project prior to the execution of the June 16, 1999 release and, thus, the events

giving rise to ILM's claims occurred prior to that date. ILM has provided no evidence to suggest that it was unaware, or could not have discovered the existence of its claims until after June 16, 1999.[2] We conclude that ILM's claims accrued prior to its signing of the June 16, 1999 release. We will, therefore, grant Suffolk's Motion with respect to those claims explicitly waived by ILM's execution of the form releases and bar any claim based on labor, materials or equipment.

**C.** *Summary Judgment Based on the Subcontract's Notice Provisions Would be Premature*

█ Suffolk has also moved for partial summary judgment contending that ILM failed to provide notice of its claims and the amounts due thereunder as required by Paragraph 8.12 of the Subcontract. Suffolk argues that timely notice of ILM's claims was critical under the Subcontract for Suffolk to preserve its right to seek payment from the Owner. Indeed, the Subcontract explicitly states that payment from the owner to Suffolk is a condition precedent to ILM being paid on its claims. *See* Subcontract, Art. 4; ¶ 8.12. Suffolk asserts that ILM never provided written notice of its claims for increased labor charge or lost profits, and, therefore, such claims should be dismissed. Suffolk further states that ILM's claims based on extra supervision and increased cost of material warrant dismissal because written notice of those claims was not provided within ten days of accrual. Relying on *Allied Fire & Safety Equipment Co. v. Dick Enterprises, Inc.,* 972 F.Supp. 922, 929 (E.D.Pa.1997) (citing *Envirex, Inc. v. Ecological Recovery Assocs., Inc.,* 454 F.Supp. 1329, 1338 (M.D.Pa.1978)), Suffolk

**2.** Indeed, Rogers' own testimony reveals that he had calculated his delay damages on a bi-weekly basis during the Project and, therefore, should have known the extent of ILM's damages at the time he executed the June 16, 1999 release. Rogers Dep. of May 31, 2001, at 240.

argues that courts have "strictly construed contractual provisions governing claims disputes, even though there was evidence that the defendant was aware of the dispute."

ILM responds by arguing that it provided contemporaneous oral and written notice of its delay damages on the project and, therefore, that Suffolk cannot assert surprise or prejudice by ILM's current prosecution of its claims. ILM first argues that Suffolk waived its right to written notification because it remained silent after learning of ILM's grievances through oral notice. This argument must be rejected under Pennsylvania law. *See Allied Fire & Safety Equipment Co. v. Dick Enterprises, Inc.*, 972 F.Supp. 922, 929 (E.D.Pa.1997); *Envirex, Inc. v. Ecological Recovery Assocs., Inc.*, 454 F.Supp. 1329, 1338 (M.D.Pa.1978).

ILM contends that it provided Suffolk with written notice of its claims in the following letters: the April 16, 1998 letter of Rob Snyder; the November 3, 1998 letter of Charles Rodgers; the November 12, 1998 letter of Charles Rodgers; the June 22, 1999 letter of Charles Rodgers; the August 5, 1999 letter of Charles Rodgers; and the August 6, 1999 letter of Charles Rodgers. Although the subcontract does not specifically identify the appropriate form for written notice of such claims or specify what details the notice must contain, Rodgers testified that he knew the meaning of claim meant "damages" and that ILM was required to provide specific "numbers, [i.e.,] the amount of the damage." Rogers Dep. of Mar. 26, 2001, at 127–129. Of the letters ILM directed to Suffolk, only the November 12, 1998 letter provided Suffolk with sufficient detail to obtain additional payments from

the Owner so that Suffolk could compensate ILM.[3]

Based on the lack of written notification, except for the November 12, 1998 letter, it appears that ILM failed to comply with the notice provision of the Subcontract. Suffolk would be prejudiced if now forced to pay ILM's claims without first having been able to present the claimed amounts to the Owner. ILM has presented evidence, however, that Suffolk was late in responding to ILM's Change Order requests. *See* Nov. 3, 1998 letter; Horne Dep. at 118–19. To determine the significance of this disputed fact, we turn to *Allied Fire & Safety*, a case cited by Suffolk, in which the court denied the general contractor's motion for summary judgment because there was a factual dispute as to whether the subcontractor was receiving the documents necessary to comply with the notice provision. 972 F.Supp. at 929–30, and n. 11 (requiring subcontractor to prove that general contractor's interference precluded subcontractor from complying with the subcontract's notice provision). Because we cannot resolve the dispute on the record before us, we will require ILM to prove that Suffolk impeded ILM's ability to comply with the Subcontract's notice provision by failing to respond to ILM's Change Order requests.

**D.** *Claims for Attorneys' Fees and Interest*

Plaintiff seeks an award of attorneys' fees and interest under the PCSPA, which provides that "performance by a . . . subcontractor in accordance with the provisions of a contract shall entitle the . . . subcontractor to payment from the party with whom the . . . Subcontractor has con-

---

**3.** James Horne, Suffolk's Project Superintendent, testified that the November 12, 1998 letter would suffice as notice to Suffolk that

ILM was seeking additional sums of money. (Home Dep. at 133).

tracted." 73 P.S. § 504. The PCSPA mandates that once the subcontractor has performed in accordance with the contract, the contractor must pay the subcontractor "the full or proportional amount received for [the] subcontractor's work and materials, based on work completed or services provided under the subcontract," either: (1) "14 days after receipt of each progress or final payment [from the owner];" or (2) "14 days after receipt of the subcontractor's invoice, whichever is later." 73 P.S. § 507(c). A subcontractor may bring suit if the contractor violates the PCSPA, and may recover interest of one percent per month of the amount wrongfully withheld, and "the substantially prevailing party in any proceeding to recover any payment ... shall be awarded a reasonable attorney fee." 73 P.S. § 512.

Suffolk argues that the PCSPA applies only to "progress" and "final" payments under the terms of a contract, and not to work performed under "change orders." Suffolk has not cited any case to support this distinction. Furthermore, the Subcontract in the instant action specifically includes "change order" work as part ILM's "Work." *See* Subcontract, Art. 1 (listing priority of interpretation for Subcontract). We therefore conclude that ILM's claim for attorneys' fees and interest for unpaid change orders comes within the ambit of the PCSPA.

■ ILM may not, however, recover attorneys' fees or interest under the PCSPA for claims allegedly caused by the delay of the Project. The PCSPA provides for an award of attorneys' fees and interest when litigation ensues from a contractor's failure to comply with the payment terms of the Act. 73 P.S. § 512. The PCSPA requires payment, in the form of progress or final payments, for work, services and materials, 73 P.S. § 507(c), and provides that interest shall be paid to a subcontractor in

the event that any progress or final payment is delayed, 73 P.S. § 507(d). The Act does not pertain to the delay damages sought by ILM. We therefore dismiss the portion of ILM's claim for attorneys' fees and interest based on such damages.

Aside from its statutory claim, ILM argues that it is entitled to attorneys' fees because Suffolk's defenses are groundless and have been asserted in bad faith. ILM has not, however, moved for summary judgment, and we find that Suffolk's defenses cannot be characterized as colorless, even if ILM were to ultimately succeed on its claims. Thus, we will dismiss ILM's claims for attorney's fees, except those which may be awarded under the PCSPA. ILM may thus pursue its claim for attorneys' fees and interest based only on unpaid change orders.

**E.** *The Subcontract Precludes ILM's Claim for Unjust Enrichment.*

■ ILM's unjust enrichment claim is defeated by the existence of the Subcontract. Under Pennsylvania law, "where an express contract governs the relationship of the parties, a party's recovery is limited to the measure provided by the express contract; and where the contract fixes the value of the services involved, there can be no recovery under a quantum meruit theory." *Constar, Inc. v. Nat'l Distribution Centers, Inc.,* 101 F.Supp.2d 319, 324 (E.D.Pa.2000) (citing *Hershey Foods Corp. v. Ralph Chapek, Inc.,* 828 F.2d 989, 999 (3d Cir.1987)); *Fox's Foods, Inc. v. Kmart Corp.,* 870 F.Supp. 599, 611 (M.D.Pa.1994).

ILM roots its unjust enrichment claim in the court's decision in *Shulman v. Continental Bank,* 513 F.Supp. 979, 986 (E.D.Pa.1981). There, the court held that if an agreement is unenforceable, a party may be entitled to restitution from another who has been unjustly enriched. *Id.* Critical to the court's ruling was the existence

of a material factual dispute regarding the nature of the agreement between the parties and whether there had been a meeting of the minds.

ILM does not dispute that a contract existed between it and Suffolk. However, drawing from *Shulman*, ILM argues that, because the Subcontract called for a completion of ILM's work by July 27, 1998, there was no meeting of the minds with respect to compensation for work occurring after that date. Therefore, ILM contends that the Subcontract does not cover labor and materials supplied after that date. *See* Pl. Opp. Brf. at 44.

ILM's argument flies in the face of the clear language of the Subcontract, which specifically accounts for delays and changes in the scope of ILM's work. *See* Subcontract, Art. 6; ¶ 8.6.1. Indeed, the Subcontract specifically provides how ILM would be compensated as a result of changes in work. *Id.*, ¶ 8.6.1. The existence of delays and changes in ILM's work do not render the Subcontract unenforceable, and ILM's recovery is limited to the measures provided therein. Summary judgment will be entered in favor of Suffolk on ILM's unjust enrichment claim.

## V. CONCLUSION

Defendant's Motion is granted in part and denied in part. In our view, a genuine issue of material fact exists regarding whether Suffolk interfered with, or failed to act in a marmer necessary to, ILM's prosecution of its work under the Subcontract. Therefore, we may not grant summary judgment based on Article 6. In addition, we may not grant summary judgment based on ILM's alleged failure to comply with the notice provisions of Paragraph 8.12 of the Subcontract because of a factual dispute regarding whether Suffolk impeded ILM's ability to comply with such provision.

ILM's pending claims for damages derived from labor overrun ($594,340.44) and extra material cost ($20,929.95) are, however, barred based on the express terms of the releases signed by ILM pursuant to the Subcontract. We also enter summary judgment in favor of Suffolk on ILM's claim for unjust enrichment because such claim is barred by the existence of the Subcontract. Finally, we grant summary judgment in favor of Suffolk on ILM's claims for attorneys' fees and interest, except to the extent that they are based on unpaid change orders.

An appropriate Order follows: