487 A.2d 373

**ROBINSON PROTECTIVE ALARM COMPANY**

**v.**

**BOLGER & PICKER, Appellee/Cross-appellant (Appellant at No. 1123)**

**v.**

**Richard ROBINSON and Continental Bank, Appellant/Cross-appellee**

**Appeal of CONTINENTAL BANK (at No. 1040)**

Superior Court of Pennsylvania.

Argued Aug. 22, 1984.

Filed Jan. 9, 1985.

Petition for Allowance of Appeal Granted for Appellant June 14, 1985.

Petition for Allowance of Appeal Denied for Appellee June 14, 1985.

504

506

Ronald H. Surkin, Philadelphia, for appellant (at 1040) and for appellee (at 1123).

Richard M. Jordan, Philadelphia, for appellant (at 1123) and for appellee (at 1040).

Before McEWEN, OLSZEWSKI and HOFFMAN, JJ.

OLSZEWSKI, Judge:

This case is a subplot in the story of Richard Robinson, a onetime partner in the law firm of Bolger & Picker who, in 1978 and 1979, embezzled funds from an escrow account of the law firm and converted checks belonging to clients. This action deals solely with the embezzlement of funds held for Robinson Protective Alarm Company. The question before us is who shall bear the loss.[1]

1. Richard Robinson, a former partner of Bolger & Picker, is not related to Robinson Protective Alarm. Initially, Robinson Protective

Each of the appellants, Bolger & Picker and Continental Bank, contends that the other should bear the loss. The trial court held that the loss should fall on the law firm to the extent of $206,247.75 and on Continental to the extent of $140,000. Both appeal.

The facts are these: Robinson Protective was involved in a tax dispute with the City of Philadelphia, and engaged Bolger & Picker to represent the company. The disputed tax was to go into an escrow account under the control of Bolger & Picker [2] and the tax due would be paid from this account when the parties settled. The account at Continental was opened in the name of "Bolger & Picker, Escrow Agents," and three partners, including Richard Robinson, signed a signature card enabling any one partner to withdraw funds. Continental was not a party to the escrow agreement and knew nothing of its terms. Lower court opinion at 4.

Robinson Protective paid approximately $50,000 per year into this account from 1972 to 1978; the money was kept in a passbook savings account and in certificates of deposit in the name of "Bolger & Picker, Escrow Agents."

Richard Robinson, on April 5, 1978, requested Continental to redeem a certificate of deposit and put the proceeds into the savings account. On April 6, he directed Continental to draw a check for $100,000 on the account, payable to the order of "BEDCO." [3] Lower court opinion at 16. The bank issued a treasurer's check as directed and delivered it to

sued Bolger & Picker for the escrow funds. Bolger & Picker's insurer paid the amount, $346,247.75, and Bolger & Picker sued Continental for indemnity or contribution. Continental joined Richard Robinson, who has also been sued by Bolger & Picker, and cross-claimed against Bolger & Picker for costs of litigation. Richard Robinson pleaded guilty to embezzlement and related charges before this case was tried, and took no part in this trial. He is without assets. Lower court opinion at 1–2.

2. The alarm company was required to relinquish control over the money in order to gain federal income tax benefits. Appellant's brief at 7.

3. "BEDCO," or Blythe, Eastman, Dillon & Company, handles investments. Lower court opinion at 22.

Richard Robinson. On May 4, 1978, at Richard Robinson's request, the bank redeemed a second certificate, issued a check for $140,000 payable to Blythe, Eastman, Dillon and Company, and delivered it to him. On January 2, 1979, Continental redeemed a third certificate, and issued and delivered a check for $106,247.75, payable to Bolger & Picker, Escrow Agents, again at Richard Robinson's request.[4] Richard Robinson used these checks for his own purposes.

The funds for the first check came from the savings account, which was composed in part of the proceeds of a certificate of deposit, No. 3–91891, owned by "Bolger & Picker, Escrow Agents." The funds for the second check came from a certificate of deposit, No. 3–94855, owned by "Bolger & Picker, Escrow Agents." The funds for the third check came from a certificate of deposit, No. 3–99924, owned by "Bolger & Picker, Escrow Agents." None were endorsed, as required by bank rules. Lower court opinion at 17–19.

The trial court initially held the bank liable for all three withdrawals,[5] but on the bank's exceptions, held that Continental was liable for only $140,000, the amount of the second certificate.[6] The court based its holding on 13 Pa.C.S. § 3419 (Purdon's 1984 Pamphlet), stating that the bank had not paid the certificate in accordance with reasonable commercial standards, and thus was liable for its value.[7] The lower court stated:

4. Richard Robinson endorsed this check and deposited it in his personal account at First Pennsylvania Bank. N.T. 40.1.

5. Reproduced Record at 91a (Opinion of December 24, 1982).

6. The court issued an Opinion Sur Exceptions on March 1, 1983, holding Continental liable for the $140,000.

7. The statute provides:

§ 3419. **Conversion of instrument; innocent representative**
(a) Acts constituting conversion.—An instrument is converted when:
(1) a drawee to whom it delivered for acceptance refuses to return it on demand;
(2) any person to whom it is delivered for payment refuses on demand either to pay it or to return it; or

On May 4, 1984, Continental issued a check in the amount of $140,000 payable to Blythe, Eastman, Dillon & Co., which check bore a typed notation indicating that it represented part of the proceeds of certificate deposit No. 3–94555 [8] in the name of Bolger & Picker, Escrow Agents. It also bore a handwritten notation "A/C Richard Robinson 76090–2." There is no evidence as to who placed the written notation on the check or when. This Certificate was not endorsed. It is clear that the bank was alerted to the fact that the certificate was in the name of an escrow account and that such funds were being paid to an investment company. No investigation was made by the bank before issuing the check. Such negligence is not consonant with reasonable commercial standards.

Lower court opinion at 30.

In this appeal, each party makes numerous arguments that the other should bear the entire loss. Given the complexity of the situation, we begin our analysis with the broadest assertion—the bank's claim that it has no liability whatsoever.[9]

## The Uniform Fiduciaries Act

The bank argues first that it is completely shielded from all liability for redeeming the certificates, under any theory, because of 7 Pa.S. § 6361 (Purdon's 1984–85 Supp.). This section of the Uniform Fiduciaries Act states:

> (3) it is paid on a forged instrument.
>
> . . . . .
>
> (c) Limitation on liability of representative.—Subject to the provisions of this title concerning restrictive endorsements a representative, including a depositary or collecting bank, who has in good faith and in accordance with reasonable commercial standards applicable to the business of such representative dealt with an instrument or its proceeds on behalf of one who was not the true owner is not liable in conversion or otherwise beyond the amount of any proceeds remaining in his hands.

8. This was apparently a typographical error, as the certificate's number is 3–94855. N.T. 140.2–141.2.

9. Each party lists numerous supposed errors by the trial court. We will deal with minor points in footnotes as much as possible, to conserve space.

A person who, in good faith, pays or transfers to a fiduciary any money or other property, which the fiduciary as such is authorized to receive, is not responsible for the proper application thereof by the fiduciary, and any right or title acquired from the fiduciary in consideration of such payment or transfer is not invalid in consequence of a misapplication by the fiduciary.

7 Pa.S. § 6361. The Act, if applicable, would relieve the bank of liability. The court below, however, held that the UFA did not apply to this case. Lower court opinion at 33.

■ The key to determining the applicability of the Act lies in the statute and in the intent of its drafters. The UFA's purpose is:

[To] establish uniform and definite rules in place of the diverse and indefinite rules now prevailing as to "constructive notice" of breaches of fiduciary obligations. In some cases there should be no liability in the absence of actual knowledge or bad faith; in others there should be action at peril. In none of the situations here treated is the standard of due care or negligence made the test.

7A Uniform Laws Annotated 128 (1978).

The Supreme Court held in *Davis v. Pennsylvania Company for Insurances on Lives and Granting Annuities,* 337 Pa. 456, 12 A.2d 66 (1940), that the bank's responsibility in a case such as this is to act honestly:

At what point does negligence cease and bad faith begin? The distinction between them is that bad faith or dishonesty, is, unlike negligence, wilful. The mere failure to make inquiry, even though there be suspicious circumstances does not constitute bad faith unless such failure is due to the deliberate desire to evade knowledge because of a belief or fear that inquiry would disclose a vice or defect in the transaction—that is to say when there is an intentional closing of the eyes or stopping of the ears.

*Id.,* 337 Pa. at 460, 12 A.2d at 69 (citation omitted). In *Davis,* the fiduciary was a trustee and the plaintiffs the beneficiaries of a trust. The trustee sold trust property through the bank, had the proceeds credited to the trust

account, and then withdrew the proceeds for his own use. The Court refused to hold the bank liable, stating that there were "no facts or circumstances which should have made defendant suspicious." *Id.*, 337 Pa. at 461, 12 A.2d at 69.

This Court held in *Gordon v. Hamilton Savings and Loan Ass'n.*, 207 Pa.Super. 231, 217 A.2d 843 (1966), that where the administrator of an estate had embezzled savings from an estate account, the bank could not be held liable: "The development of our statutory law has been directed toward placing the responsibility for assets held in a fiduciary capacity directly on the fiduciary, where it rightly belongs, and relieving those who deal with fiduciaries from responsibility." *Id.*, 207 Pa.Superior Ct. at 235, 217 A.2d at 845.

 It is obvious that the Act addresses the concepts of both "negligence" and "bad faith." From the drafters' comments and the interpretation given the Act by our courts, we conclude that the Act applies when the essence of the complaint is that the defendant has paid money to someone who was authorized to receive it, but who later misapplied it.[10] The Act shields banks from liability when they act honestly in fiduciary relationships, but not when they wink at obvious irregularities.

This is so that the wheels of commerce may roll easily. If banks had a duty, for their own safety, to divine the purpose of every fiduciary's transaction, expensive and time-consuming exercises in futility would result, since most fiduciary dealings are honest. Additionally, it would seem reasonable to assume that a determined embezzler

---

10. When a bank pays money to a person who is not authorized to receive it, it would seem that an action for conversion under 13 Pa.C.S. § 3419 would lie, or that an action based in 13 Pa.C.S. § 4401 would be appropriate. The law firm has argued that § 4401 is an appropriate vehicle for liability here. Appellee/Cross-appellant's Brief at 14. This is erroneous, since, even if we assume that certificates are "accounts" under the UCC, which we do not, the certificates were properly payable to "Bolger & Picker, Escrow Agents," or an authorized agent. Richard Robinson was an authorized agent. What the firm really complains of is its former partner's disposition of the funds once the bank paid them to him.

could falsify the accreditation needed to pass any cursory investigation instituted by a bank.[11]

■■■ Although the essence of the law firm's complaint is that the bank paid certificates of deposit to an authorized person who later misapplied the funds, its complaints aver that the bank is liable in indemnity or contribution, and that the bank breached its contracts with the law firm.[12] The Uniform Fiduciaries Act was not designed to supersede contract law. The lower court correctly held that in this case, with the causes of action before the court, the UFA did not apply.[13]

## The Theory of Liability

■■ The UFA protects banks only in actions for negligence. The lower court found for the bank on two of the certificates. Given that the law firm did not plead the bank was liable in negligence, the law firm must have pleaded and proved some other cause of action for us to affirm the relief granted. The law firm originally sued for indemnity or contribution, and breach of contract. The trespass and assumpsit actions were based on the bank's alleged breach of the escrow agreement, and the breach of contract was based on the terms of the certificates of deposit. We address these issues in order.

■■■ The court below held that the bank, having never received a copy of the escrow agreement, was not liable for failing to live up to its terms. Lower court opinion at 28. When the trial court has made a finding of fact, we will not

11. For comments on the drafters' purposes, see Uniform Fiduciaries Act, 24 Colum.L.Rev. 661 (1924); Uniform Fiduciaries Act, 81 U.Pa.L. Rev. 863 (1933).

12. The law firm's original complaint demanded indemnity or contribution, basing its claim generally on the escrow agreement. An amended complaint stated causes of action in trespass and assumpsit—trespass for indemnity and contribution, and assumpsit for breach of the escrow agreement. The law firm amended its pleadings again on the eve of trial, for breach of the terms of the certificates, and the bank bitterly contests the propriety of that amendment.

13. The court below stated that with a cause of action in contract, the UFA was inapplicable. Lower court opinion at 33.

overturn it when evidence in the record supports the finding. *Spatz v. Nascone,* 283 Pa.Super. 517, 424 A.2d 929 (1981). We agree with the trial court's determination that Continental did not know of the escrow agreement and therefore had no duty to conform to its terms; we affirm the trial court's holding that no liability for indemnity or contribution arises from the escrow agreement. Likewise, there was no breach of contractual duties arising from the escrow agreement where the bank knew nothing of the agreement.[14]

The bank's liability, then, must arise from its breach of the terms of the certificates. Before we address the terms of the contract, we must deal with the bank's contention that the trial court improperly permitted the law firm to amend its pleadings, on the eve of trial, to state this theory of liability.

 A trial court may allow amendment at any time, under Pa.R.Civ.P. 1033. Whether amendment should be allowed is discretionary, but the court should not allow it when surprise or prejudice will result. *William Penn Parking Garage, Inc. v. City of Pittsburgh,* 464 Pa. 168, 346 A.2d 269 (1975); *Berman v. Herrick,* 424 Pa. 490, 227 A.2d 840 (1967).

 The bank claims it was prejudiced because it had not deposed Richard Robinson as to his customary practices in redeeming certificates, and because a witness it would have called otherwise was not available when the new theory was argued. Appellant's brief at 36. The bank argues that it would have submitted evidence on a course of dealing

---

14. Although Richard Robinson, in his deposition, stated that he had given the bank a copy of the agreement, the court discarded his testimony as not credible. Lower court opinion at 28.

The law firm argues that if the escrow agreement was never given the bank, the bank nonetheless accepted the funds as a special deposit, which restricted its capacity to pay them out.

Appellee/Cross-appellant's brief at 21. The trial court found that the bank knew nothing of the agreement. We will not overturn that finding. The law firm argues additionally that there was an implied contract with the bank. We reject this theory for the same reason.

between Richard Robinson and the bank that would have established that no breach of the terms of the certificates occurred.[15] The law firm contends that the evidence would not have been admissible. Appellee/Cross-appellant's brief at 45.

■■ Our examination of the pleadings indicates that the law firm's claim of breach of the escrow agreement afforded the bank adequate opportunity to prepare for the theory proposed in the amended complaint. The escrow agreement, being a contract, was subject to the same legal arguments about "course of dealing" that the bank states it would have made had it known of the theory premising liability on breach of terms of the certificates. We find no prejudice.

■■ With respect to the alleged breach of the terms of the certificates, the contract of redemption on the face of the certificates clearly states that they "may be redeemed on presentation and surrender duly endorsed." Record at 743a, 745a. We think that this requires endorsement before redemption. The bank failed to require endorsement before redemption. There was a breach.[16]

15. The Uniform Commercial Code permits a "course of dealing" to "give particular meaning to and supplement or qualify terms of an agreement." 13 Pa.C.S. § 1205(d) (Purdon's 1984 Pamphlet). Contracts may be read in the light of a course of conduct even when the terms are clear and unambiguous. *Campbell v. Hostetter Farms, Inc.,* 251 Pa.Super. 232, 380 A.2d 463 (1977).

16. The bank makes spirited arguments that there was no breach because the terms were for its benefit and protection and were waivable by the bank. Appellant's brief at 31. We cannot say that the law firm did not regard the endorsement requirement as protection for itself, since no evidence was submitted on the issue, and thus cannot hold that one party's waiver was effective as to both parties.

The bank additionally argues that it had no duty to investigate Richard Robinson's authority before paying to him the certificates. Since there is a second basis for relief, we need not hold on this contention.

The bank, finally, argues that the trial court erred in adopting certain findings of fact and in holding that public policy dictated that the loss fall in part on the bank. The findings of fact appear to be supported by evidence; we do not believe that the public policy of

The bank, however, is protected in part from liability for its breach by 13 Pa.C.S. § 3419(c). This section of the UCC states:

**§ 3419. Conversion of instrument; innocent representative**

. . . . .

(c) Limitation on liability of representative.—Subject to the provisions of this title concerning restrictive endorsements a representative, including a depositary or collecting bank, who has in good faith and in accordance with the reasonable commercial standards applicable to the business of such representative dealt with an instrument or its proceeds on behalf of one who was not the true owner is not liable in conversion or otherwise to the true owner beyond the amount of any proceeds remaining in his hands.

13 Pa.C.S. § 3419(c).

In our opinion, this shields the bank from liability in breach of contract claims when it acts in accordance with reasonable commercial standards. Since the bank acted reasonably in redeeming the first certificate to the savings account and the third in a check to its owner, it is shielded with respect to those two items. It is not shielded with respect to certificate 3–94855, and is liable in contract to the law firm for its value.

Judgment affirmed.

McEWEN, J., concurs in the result.

enabling commerce to move freely permits the bank to roll over the rights of all innocent parties all the time.