G.R. SPONAUGLE & SONS,
INC., Plaintiff

v.

HUNT CONSTRUCTION GROUP,
INC., Defendant.

Civil No. 1:CV–03–1118.

United States District Court,
M.D. Pennsylvania.

Sept. 17, 2004.

Donna L. Fisher, Esq., Michael P. Subak, Esq., William H. Johnson, Esq., Pepper Hamilton LLP, Harrisburg, PA, for Plaintiff.

Andrew L. Swope, Esq., Christopher R. Nestor, Esq., David R. Fine, Esq., Kirkpatrick & Lockhart Nicholson Graham LLP, Harrisburg, PA, for Defendant.

## MEMORANDUM

CALDWELL, District Judge.

### I.  *Introduction.*

Plaintiff, G.R. Sponaugle & Sons, Inc., was the electrical subcontractor for defendant, Hunt Construction Group, Inc., the general contractor for the construction of the Giant Center ("the project"), a 306,-000–square–foot indoor arena in Hershey, Pennsylvania. The project fell behind schedule, occasioning additional costs for Sponaugle not contemplated by the subcontract. In this diversity action controlled by Pennsylvania law, Sponaugle is attempting to recover those additional costs, which it attributes to Hunt's delay in seeing the project through to completion. It is also seeking to recover for sums it alleges it is due for work as authorized by the subcontract.

Plaintiff has set forth three causes of action. Count I is for breach of contract and alleges that Hunt failed to pay Sponaugle for all the work it performed as specified in the subcontract. Count II is also for breach of contract, but for the additional costs Plaintiff incurred based on Hunt's alleged delay and interference with Sponaugle's work. Count III is for a violation of the Pennsylvania Prompt Payment Act, 62 Pa.C.S.A. §§ 3901–3942, and alleges that Hunt's failure to pay Plaintiff all of the sums due for work originally authorized by the subcontract violated that act. The amount in controversy for Count II is about $1.25 million.

We are considering Defendant's motion for summary judgment which makes three arguments. First, count II is barred because Sponaugle released Hunt from any claims stemming from the project when Plaintiff periodically applied for progress payments under the subcontract. Second, count II is also barred because Sponaugle did not comply with the subcontract's procedural requirements for making claims against Hunt arising under the agreement. Third, counts I and III are barred because Hunt complied with its payment obligations under both the subcontract and the act.[1]

We will evaluate Defendant's motion under the well-established standard, *see Anderson v. Consolidated Rail Corp.,* 297 F.3d 242, 246–47 (3d Cir.2002). The summary-judgment record is as follows, viewed in the light most favorable to Plaintiff, the nonmoving party. *Id.* at 247.

### II.  *Background.*

In September 2000, Hunt entered into a general contract with Regional Area Management, LLC to build the arena. Regional Area Management was the agent for the local development authority, the arena's owner. On April 6, 2001, Hunt

---

1.  In its answer, Hunt filed two counterclaims, asserting that Sponaugle's delay in performing under the subcontract caused Hunt to incur liquidated damages under its contract with the project's owner and extra costs to itself. Those claims are not at issue in this motion.

subcontracted the project's electrical work to Sponaugle, with the subcontract back-dated to February 8, 2001.

Section 5.5 of the subcontract essentially provided, in pertinent part, that after Hunt received a payment from the owner on the general contract, it would pay Sponaugle its proportional share of the payment. For Sponaugle to obtain payment for its work under the agreement, section 5.2 of the subcontract required it to submit "progress payment applications on forms approved by Hunt." Each payment application also had to have "attached" a "fully-executed, current Monthly Statement of Subcontractor to Hunt and fully-executed Affidavit and Partial Waiver of Claims and Liens and Release of Rights, on forms acceptable to Hunt, reflecting all previous progress payments." (Doc. 22, ex. B §§ 5.2 and 5.2(a)(6)).

These forms were prepared by Hunt. In pertinent part, the release, captioned "Affidavit and Partial Waiver of Claims and Liens and Release of Rights," reads as follows:

> In addition, for and in consideration of the amounts and sums received, [Sponaugle] hereby waives, releases and relinquishes any and all claims, rights or causes of action whatsoever arising out of or in the course of the work performed on [the project], contract or event transpiring prior to the date hereof, excepting the right to receive payment for work performed and properly completed and retainage, if any, after

the date of the above-mentioned payment application or invoices.

(Doc. 22, ex. D).[2]

Section 9.7 of the subcontract obligated Sponaugle to "work overtime and/or add additional manpower or shifts" if Hunt ordered it to do so. Subparagraphs (a) and (b) of this section allocated the extra expense of this additional work depending upon fault. If Sponaugle was not behind schedule, subparagraph (a) required Hunt to pay Sponaugle for the additional wages caused by the extra work but no overhead or profit. If Sponaugle was behind schedule "through its own sole or partial fault," subparagraph (b) made Sponaugle responsible for the extra expense. (Doc. 22, ex. B).

Section 10.2 sets forth a procedure for Sponaugle to make claims against Hunt for extra costs caused by Hunt. The section also provided that Sponaugle's failure to comply with the procedure would act as an irrevocable waiver of any claims. In pertinent part, section 10.2 provides as follows:

> **Delays Caused Solely by Hunt:** Should Subcontractor's Work be delayed, disrupted or interfered with solely as a result of acts or omissions of Hunt or anyone employed by Hunt on the Project, then, at Hunt's sole discretion, Hunt shall provide Subcontractor either:
>
> (a) . . . ; or
>
> (b) additional compensation as provided in Section 9.7(a), but only if a written claim for delay is submitted to Hunt within forty-eight (48) hours from the

---

2. Defendant's motion cites a paragraph of the release in which Sponaugle waives and releases the owner and Hunt from any and all claims and liens and rights to liens upon the premises. That paragraph is not the dispositive one for this motion.

Defendant's motion also cites another document that has to be attached to each payment application, a "fully-executed, current Monthly Statement of Subcontractor to Hunt." The "Statement" also appears not to be dispositive here, *see Associated Mech. Contractors, Inc. v. Martin K. Eby Constr. Co.,* 964 F.Supp. 1576, 1581 (M.D.Ga.1997), and its effects need not be considered at this time.

time of the commencement of such delay, disruption or interference.

Failure to provide such written claim within the prescribed time period shall result in an irrevocable waiver of any such claim. The extension of time or the additional compensation provided pursuant to this Section 10.2 shall be the sole and exclusive remedy that Subcontractor shall have against Hunt for delays, disruptions or interferences caused by the acts or omissions of Hunt or anyone employed by Hunt on the Project. . . .

(*Id.*).

Section 34.2 sets forth another claims procedure broader in scope than section 10.2. Section 34.2 provides, in pertinent part, that "[i]f the Subcontractor has a dispute with Hunt regarding the application or interpretation of any provision of this Subcontract or the breach thereof," the subcontractor shall submit its claim in writing within ten days, "attaching all supporting documentation."

The construction schedule called for substantial completion of the project by September 30, 2002. While this deadline was essentially met,[3] the goal was accomplished by changing and accelerating the work schedules for the various subcontractors, including Sponaugle, as the project fell behind. Plaintiff alleges it incurred additional costs when Hunt required it to work overtime, in a random and inefficient manner and in congestion with other subcontractors, (Compl., ¶¶ 18 and 24), attributing delays and disruptions to Hunt and other subcontractors.

The disruption of Plaintiff's work began on March 29, 2002. By May 9, 2002, Plaintiff knew that it would exceed the labor hours it had originally planned for the subcontract, and the parties began to discuss how to complete the project in a timely fashion.

On June 12, 2002, Plaintiff sent a letter to Defendant expressing its concern with Hunt's existing construction schedule, complaining that Sponaugle could not get to certain areas of the project as they were not yet finished by other trades or were inaccessible because of the delay of other trades. (Doc. 22, ex. N). The letter also stated the following:

> We feel we are providing adequate manpower to meet current construction requirements, but looking ahead, see the possible requirement of overtime needed to meet the construction schedule finish dates. Performing work on an overtime basis to meet a schedule that is obviously "in-flux" was not in our construction costs submitted at bid time. We are presently working weekends (at our cost) to perform work where we are "inconveniencing" other trades working in areas that were designated to be complete at this time per your schedule.
>
> If overtime is required for this reason in the future, [Sponaugle] is requesting that Hunt negotiate additional monies for us to perform the work required as we cannot continue to work overtime at our expense.

*Id.*

Nine days later, on June 21, 2002, Sponaugle and Hunt met at the work site to discuss the status of the project. According to Sponaugle, the purpose of the meeting was to discuss why the *project* was behind schedule. According to Hunt, its purpose was to discuss why *Sponaugle* was behind schedule. At the meeting, Plaintiff

---

**3.** The owner's agent decided that the project was not substantially completed until October 7, 2002.

informed Hunt that the delays and disruptions were not its fault, and it expected to be compensated if its work schedule was accelerated. (Doc. 26, ¶ 26; doc. 28, ex. 26, p. 5).

Five days later, on June 26, 2002, Hunt put Sponaugle on notice that its work on the project was behind schedule. Invoking section 9.7, but not mentioning either subparagraph (a) or (b) of that section, Hunt also directed Sponaugle by this letter to add additional manpower and to work overtime until its work was back on schedule. (Doc. 22, ex. O). By letter dated June 28, 2002, Sponaugle responded that it would comply with Hunt's directive and had begun an accelerated work schedule on June 24, 2002, but that it would "track the work separately and seek recovery for the costs." *Id.* In this letter, Sponaugle placed the blame for having fallen behind on the slow work activities of predecessor subcontractors and expressed the view that Hunt was getting the project back on schedule by putting the responsibility and the costs of doing so on the subcontractors who had not caused the delay. *Id.*

On July 1, 2002, Hunt replied that it issued its overtime directive because Sponaugle was not adequately staffing the project and not meeting scheduled deadlines. *Id.* Defendant also noted that the project was to be substantially completed by September 20, 2002; otherwise it would be liable for liquidated damages, with Sponaugle liable for a pro-rated share. *Id.*

During the course of its performance, Sponaugle submitted twenty-one payment applications to Hunt from May 2001 through January 2003. Each payment application listed a total payment due based upon Sponaugle's stated completion of the contract work to the date of the payment application. After the first application, as required by section 5.2(a)(6) of the subcontract, each payment application included the executed release Sponaugle had to sign. In total, Sponaugle submitted with its payment applications twenty signed releases, the last one dated January 20, 2003. (Doc. 22, ex. D). When submitting these applications, Sponaugle neither mentioned that it intended to make a claim for extra work nor did it actually make such a claim on any of the releases or the "Statements" that also had to accompany the application. (Doc. 21, Hunt SMF, ¶¶ 9–15).

Sponaugle did make such a claim on three occasions apart from the contractual payment-application process. On September 9, 2002, Plaintiff requested "payment for all overtime through September 8, 2002, which [Hunt] directed us to perform per [Hunt's] letter dated June 26, 2002. These costs are for the overtime portion only. We will be submitting a change order for the inefficiencies that are being caused as a direct result of delays in the constructions schedule when they are finalized." (Doc. 22, ex. Q). Sponaugle also enclosed an updated construction schedule with anticipated completion dates per work activity and a partial invoice for $188,321. *Id.* The invoice set forth the number of hours worked in overtime and premium time and the cost of this work. *Id.*

On October 11, 2002, Hunt rejected the September 9 letter and invoice. (Doc. 21, ¶ 35). Hunt wrote that Sponaugle's letter "lacked any substantive information or facts regarding the costs; therefore, your request for a change order is hereby rejected by Hunt. We do not believe that [Sponaugle] is entitled to any additional funds for overtime worked or alleged delays in the construction schedule." (Doc. 22, ex. Q).

On October 23, 2002, Sponaugle made its second attempt at payment for its extra work. It submitted two invoices (in the same form as the one sent September 9, 2002) totaling $261,100.77 for the overtime

portion of the work completed from June 26, 2002, through the completion of the project. (Doc. 22, ex. R). Also, Sponaugle stated that as "a result of schedule delays that created concurrent or stacked construction activities, which congested the areas of work that were available, we will be submitting additional charges for these inefficiencies when they are finalized." *Id.* On October 25, 2002, Hunt again declined to pay, for the same reasons given in its October 11 letter. *Id.*

On April 11, 2003, Sponaugle made a final attempt to recover its extra costs. It submitted a request for "Equitable Adjustment" seeking compensation for the alleged disruptions and delays to its work on the project in the amount of $1,254.159.00. (Doc. 22, ex. E). Hunt rejected this request, claiming it was not factually accurate.

Relevant to counts I and III, the claims seeking compensation for work performed as originally contemplated by the subcontract, on January 20, 2003, Sponaugle submitted two payment applications to Hunt, numbers 20 and 21; number 20 was for $16,433 and number 21 for $212,099. (Doc. 21, Defendant's SMF, ¶ 44). Hunt received these applications on January 23, 2003. On the same day, Defendant returned them to Sponaugle, rejecting them as incomplete because Sponaugle had failed to execute and return certain change orders that were the bases of the applications, change orders 14, 15, 27, 28 and 29. (*Id.,* ¶ 47). Change orders 14 and 15 had zero costs, (doc. 28, Pl.'s attach. 25), number 27 had already been covered in payment application number 19, paid in December 2002, (doc. 22, ex. D); and together with numbers 28 and 29 added about $15,634 to the cost of the subcontract. (Doc. 28, Pl.'s attach. 25).

Sponaugle did not execute these change orders, nor did it resubmit them. (Doc.

21, Defendant's SMF, ¶¶ 47 and 48). Nonetheless, on December 18, 2003, some eleven months later, Hunt sought payment from the owner's agent, for these payment applications, although recommending to the agent that payment be conditioned on Sponaugle's execution of the change orders and its compliance with the terms of the release it signed when submitting the applications. (Doc. 21, Defendant's SMF ¶ 49 and doc. 26, Plaintiff's response, ¶ 49).

On March 3, 2004, the agent issued a joint check to Hunt and Sponaugle as payment on the applications. (Doc. 21, Defendant's SMF ¶ 50). On March 9, 2004, Sponaugle's bonding company forwarded a consent of surety to Hunt, and on March 24, 2004, Hunt signed and then forwarded the joint check to Sponaugle. (*Id.,* ¶¶ 52 and 53).

On March 5, 2004, Sponaugle submitted payment application number 22 for $10,000, representing the final amount of Hunt's retention on the subcontract. Hunt included this amount in its final payment application to the owner's agent on April 21, 2004, which was not yet paid at the time Defendant's summary-judgment motion was being briefed.

## III. *Discussion.*

### A. *The Release.*

Defendant argues that the release Sponaugle submitted with its payment applications bars the claim for breach of contract in count II based on the extra expense Sponaugle allegedly incurred because of Hunt's work directives and Defendant's interference with Sponaugle's work.

■ Before getting to this argument, however, we must discuss Plaintiff's contention that Hunt waived the affirmative defense of release by not including it in its answer, as required by Fed.R.Civ.P. 8(c). We disagree.

242

It is true that Hunt failed to plead release in its answer,[4] and that Rule 8(c) required it to do so, *see Eddy v. Virgin Islands Water & Power Authority*, 256 F.3d 204, 209 (3d Cir.2001), but Hunt's failure is not an automatic waiver of this affirmative defense. *Id.* In addition, as Defendant points out, it is enough if the defense was raised " 'at a pragmatically sufficient time, and [the plaintiff] was not prejudiced in its ability to respond.' " *Id.* (quoting *Charpentier v. Godsil*, 937 F.2d 859, 864 (3d Cir.1991)). Thus, since the defense of release presents only a question of law, and Plaintiff does not argue any prejudice, we can consider it on Defendant's motion for summary judgment. *See Kleinknecht v. Gettysburg College*, 989 F.2d 1360, 1373 (3d Cir.1993)(concluding that failure to raise defense of immunity in answer did not preclude its consideration on summary judgment when issue was purely one of law and the plaintiff could show no prejudice).[5] We will therefore address the merits of Defendant's argument.

Under Pennsylvania law, a release is a contract, *see Evans v. Marks*, 421 Pa. 146, 218 A.2d 802 (1966)(treating a release as a contract in a dispute about the release's scope); *Sparler v. Fireman's Ins. Co.*, 360 Pa.Super. 597, 601, 521 A.2d 433, 434 (1987)(en banc); *Bickings v. Bethlehem Lukens Plate*, 82 F.Supp.2d 402, 404 (E.D.Pa.2000), and governed by the rules of contract construction. *Sparler, supra; Bickings, supra.*

"In Pennsylvania, it is well settled that the effect of a release is to be determined by the ordinary meaning of its language." *Taylor v. Solberg*, 566 Pa. 150, 155, 778 A.2d 664, 667 (2001); *Republic Ins. Co. v. Paul Davis Systems of Pittsburgh South, Inc.*, 543 Pa. 186, 189, 670 A.2d 614, 615 (1995), which means that, assuming the language is clear and unambiguous, the court looks no further than the language in interpreting the release, *id.*, even if the language is broad or general, *id.*, and no matter how "improvident" the agreement may later prove to be for one of the parties. *Taylor*, 566 Pa. at 155, 778 A.2d at 667 (citing *Buttermore v. Aliquippa Hospital*, 522 Pa. 325, 329–30, 561 A.2d 733, 735 (1989)). *Accord Camiolo v. State Farm Fire & Casualty Co.*, 334 F.3d 345, 361–62 (3d Cir.2003)(relying on plain language of the release to determine its scope under Pennsylvania law).[6]

■ Consistent with this approach, a party cannot evade the clear language of a

---

**4.** We reject Hunt's argument that it pled release in its answer when it asserted as a defense that Plaintiff "does not possess the right to commence or maintain any claims against Hunt." (Doc. 7, ¶ 56). This language is too general.

**5.** Based on this ruling, we need not consider Defendant's other argument that the defense was raised early enough in the joint case-management plan which listed one of the legal issues in dispute as: "[w]hether [Sponaugle] has waived the right to commence or maintain all or part of this action against [Hunt]." (Doc. 12, ¶ 1.44).

**6.** Sometimes courts interpreting the scope of a release speak of factors apart from the language of the release being relevant to its interpretation, such as what was within the parties' contemplation at the time, or the circumstances surrounding the execution of the release. *Camiolo, supra*, 334 F.3d at 360–61; *Vaughn v. Didizian*, 436 Pa.Super. 436, 648 A.2d 38, 40 (1994) (the surrounding circumstances clarify the intention of the parties and identify "matters which may be fairly said to have been within the contemplations of the parties when the release was given"). However, when the language is clear and unambiguous, these considerations are controlled by the language of the release itself. *See, e.g., Camiolo*, 334 F.3d at 361 (rejecting a "contemplation of the parties" argument based on certain circumstances surrounding the execution of the release when the plain language of the release indicated otherwise).

release by contending that the party did not subjectively intend to release the claim at issue. *Jordan v. SmithKline Beecham, Inc.*, 958 F.Supp. 1012, 1020 (E.D.Pa.1997) (citing *Buttermore, supra*, 522 Pa. at 328–29, 561 A.2d at 735, which rejected the plaintiff's argument that by signing a release for a third-party individual it was not his intent to release the defendants when the clear language of the release showed otherwise); *see also Bickings, supra*, 82 F.Supp.2d at 406.

■ Applying the forgoing principles of Pennsylvania law, we conclude that the release Sponaugle submitted with its payment applications bars the instant action seeking recovery for Sponaugle's extra work allegedly caused by Hunt's delay and interference. In pertinent part, the release provides that Sponaugle "waives, any and all claims, rights or causes of action whatsoever arising out of or in the course of the work performed on [the project] ... prior to the date" of the particular payment application. This language is broad but the aspect relevant here is that it is plain, clear and unambiguous and waives any and all claims arising out of work performed on the project before the date of the particular payment application. This means that Sponaugle certainly waived its right to recover for any extra work when it submitted the January 20, 2003, release.

Pennsylvania cases support our conclusion as to the scope of the instant release. In *Republic Ins. Co., supra*, the Pennsylvania Supreme Court barred an insurance company from pursuing a subrogation claim against the alleged tortfeasor based upon the very release the insurance company had obtained from its insured, releasing in broad yet plain terms not only the insurance company but "any and all other persons" as well "from any and all actions ... claims ... of whatsoever kind or nature." 543 Pa. at 189–90, 670 A.2d at 615. The supreme court rejected the superior court's reasoning that the case could proceed because the release of a tortfeasor was not within the contemplation of the parties, only the release of contract claims against the company. *Id.* at 188, 670 A.2d at 615. In *Buttermore, supra*, the supreme court held that this same language barred the injured plaintiff from suing a hospital, doctors and other health-care personnel when he released the tortfeasor after a settlement. 522 Pa. at 328–30, 561 A.2d at 734–35. *See also Taylor, supra* (defendants were entitled to reduction of the damages assessed against them based on plain language in the release the plaintiff entered into with another defendant even though they were not parties to the release and did not contribute to the settlement).

Our ruling is buttressed by *ILM Sys., Inc. v. Suffolk Constr. Co.*, 252 F.Supp.2d 151 (E.D.Pa.2002), where the Eastern District held under Pennsylvania law that language of a release similar to the language here barred the subcontractor-plaintiff from making a claim for damages caused by delay (except for lost profits). 252 F.Supp.2d at 159 n. 1.[7]

Other courts have also reached the same result when considering essentially the same language under state contract law the same as Pennsylvania's. *See Kay–R Elec. Corp. v. Stone & Webster Constr. Co.*, 23 F.3d 55, 58–59 (2d Cir.1994)(applying New York law); *Galin Corp. v. MCI Telecomm. Corp.*, 12 F.3d 465, 468–69 (5th Cir.1994)(applying New York law); *Wayne J. Griffin Elec., Inc. v. Dunn Constr. Co.*, 622 So.2d 314 (Ala.1993)(applying Alabama law); *Morganti Nat'l Inc. v. Petri Mech. Co.*, 2004 WL 1091743 at *5–6

---

**7.** Plaintiff's attempt to distinguish *ILM Sys., Inc.* is unpersuasive.

(D.Conn.)(applying Connecticut law); *see also Worth Constr. Co. v. I.T.R.I. Masonry Corp.*, 2001 WL 209924 at *5–6 (S.D.N.Y.) (applying New York law).

Sponaugle makes the following two arguments against application of the release. First, "the parties' contemporaneous conduct" (opposing brief, p. 8) demonstrates that neither of them understood the release to bar claims for additional work. In support, Sponaugle points to payments Hunt made on payment applications that included requests for work performed before earlier payment applications had been submitted, accompanied by a release that Hunt now maintains would have barred payment for the earlier work.

There is authority for considering course of conduct in interpreting a contract. *See Matthews v. Unisource Worldwide, Inc.*, 748 A.2d 219, 222 (Pa.Super.2000); *Robinson Protective Alarm Co. v. Bolger & Picker*, 337 Pa.Super. 503, 515 n. 15, 487 A.2d 373, 379 n. 15 (1985), *rev'd on other grounds*, 512 Pa. 116, 516 A.2d 299 (1986). However, we believe course of conduct does not assist Plaintiff here because, as Defendant points out, the payments Hunt made for earlier work, despite Plaintiff's apparent release of such payments, were all based on change orders for work that Hunt had agreed to, not on work Hunt would dispute was its responsibility under the contract. Since the factual circumstances are different, course of conduct can provide no guidance.

██ Second, Sponaugle contends that, despite the language of the release, industry custom or practice has interpreted the release as not barring claims for extra work. As Sponaugle's co-president affirmed in an affidavit: "[C]onsistent with my 17 years of experience in the industry … releases submitted with monthly payment applications are not construed as general releases barring subsequent requests for payment." (Doc. 28, ex. 11.¶ 8).

We reject this argument because industry custom or practice can only be used for an ambiguous contract, *Smith v. Penbridge Assocs., Inc.*, 440 Pa.Super. 410, 418, 655 A.2d 1015, 1019 (1995); *Commonwealth, State Highway & Bridge Auth. v. E.J. Albrecht Co.*, 59 Pa. Commw. 246, 253, 430 A.2d 328, 331 (1981), and the instant release is not ambiguous.

We therefore conclude that the releases Plaintiff executed throughout the project, culminating in the January 20, 2003, release, bars any claim for extra work supposedly caused by Hunt's delay and requires us to enter summary judgment against Plaintiff on count II of its complaint.

**B. *Failure to Follow the Claims Procedure Under the Subcontract.***

Hunt also contends that Sponaugle waived its claim for extra work because it did not comply with the procedural requirements in the subcontract for making claims against Hunt for delay or interference. In part, the argument is based on Sponaugle's alleged failure to comply with section 10.2(b)'s requirement, commonly called a notice provision, for submitting those types of claims within forty-eight hours after the delay and section 34.2's requirement to provide "supporting documentation" when a subcontractor has a "dispute" with Hunt about the "application or interpretation" or "breach" of the subcontract.

We have reviewed the arguments of the parties on this issue, which raises questions about what constitutes a section 10.2(b) claim under the subcontract, whether section 34.2 applies to such a claim, and if so, what is sufficient documentation under section 34.2. Since Hunt's argument based on the release is

plainly dispositive of count II of the complaint, we see no need to rule on this argument.

## C. Claims for Breach of Contract and For Violation of the Prompt Payment Act.

■ Count I of the complaint makes a claim for breach of contract for payments allegedly due for work performed as authorized by the subcontract. Count III of the complaint makes a claim for the same sums, alleging that Hunt violated Pennsylvania's Prompt Payment Act (or Prompt Pay Act), 62 Pa.C.S.A. §§ 3901–3942, by withholding them. At issue here are the amounts covered by payment applications 20, 21 and 22. Number 20 was for $16,433 and number 21 for $212,099, for a total of $228,532. Number 22 was for the final retention amount of $10,000.

In moving for summary judgment on the breach-of-contract claim, Hunt makes the following arguments. It contends that its obligation to pay Plaintiff under the subcontract was contingent upon first receiving payment for the work at issue from the owner's agent, citing sections 5.5, 5.7 and 5.9 of the subcontract. Thus, in regard to payment application number 22, Hunt did not breach the contract because Sponaugle submitted that payment application to Hunt on March 5, 2004, Hunt included that amount in its final payment application to the owner's agent, and Hunt has not yet been paid. In regard to payment applications 20 and 21, Hunt paid those promptly after receiving payment from the owner's agent. Hunt also argues on the latter two applications that Plaintiff's failure to comply with section 5.2 of the subcontract, and submit executed change orders with the applications, means that Hunt never had any contractual obligation to pay Plaintiff for these payment applications.

In its opposition brief, Plaintiff concentrates on violations of the act rather than on any breach of the subcontract by Hunt, but we agree with Defendant that there has been no breach here. Section 5.2(a)(7) permitted Hunt to request "such other documents as may from time to time be required by Hunt," and Defendant's request for executed change orders in connection with payment applications 20 and 21 comes within this contractual right. (At that point, Sponaugle could have complied with the request or challenged Hunt's position under section 34.2.) As to payment application 22, submitted to Hunt on March 5, 2004, Hunt included this amount in its final payment application to the owner's agent on April 21, 2004. Although Sponaugle has not yet been paid on this application, the process Hunt has followed is the one contemplated by the subcontract. (Doc. 22, ex. B, § 5.5). Thus, Hunt is entitled to summary judgment on Plaintiff's breach-of-contract claim. We turn now to the Prompt Payment Act claim.

■ The act imposes certain obligations on governmental agencies and other contracting parties for construction contracts covered by the act. In pertinent part, a subcontractor's performance that complies with the subcontract entitles the subcontractor to payment from its contractor. See 62 Pa.C.S.A. §§ 3931(b) and 3933(a). When a subcontractor has performed under its agreement, "the contractor shall pay to the subcontractor ... the full or proportional amount received for each such subcontractor's work and material, based on work completed or services provided under the subcontract, 14 days after the receipt of a progress payment." Id. at § 3933(c). The contractor does not have to comply with section 3933(c) and may withhold payment for a "deficiency item" if the governmental agency does so, id. at

§ 3934(a) and (b), but must give the sub-contractor its reasons for doing so "within 15 calendar days of the date after the receipt of the notice of the deficiency item from the government agency." *Id.* at § 3934(b). Within twenty days of a contractor's receipt of payment, the contractor must also pay its subcontractors "their earned share of the payment." *Id.* at § 3922.

These obligations are basic, but the act provides remedies for a violation, all three of which Sponaugle is pursuing here. If a progress payment is not made to a subcontractor either by the contractual deadline or the statutory fourteen-day deadline in section 3933(c), the contractor is liable for interest as well as the amount due. *Id.* at § 3933(d). If a payment is withheld in "bad faith" (for an "arbitrary or vexatious" reason), a penalty of one percent per month on the amount withheld may be imposed. *Id.* at § 3935(a). A party prevailing on any claim under the act is entitled to attorney's fees incurred in pursuing the claim. *Id.* at § 3935(b).

In moving for summary judgment, Hunt argues that it did not violate the act because under sections 3922 and 3933(c) its obligation to pay Sponaugle for its subcontract work is dependent upon payment from the owner through its agent. Thus, as to payment application 22 for $10,000, since Hunt has not yet received payment from the agent, it cannot be liable to Plaintiff under the act for not making payment on this application. As to payment applications 21 and 22, Defendant maintains that it validly exercised its right under the subcontract to request executed change orders. Thus, it could not have acted in bad faith, as required by section 3935(a), in not making immediate payment on these applications. Defendant also points out that on December 18, 2003, it eventually requested payment from the owner's agent on these applications, even though Sponaugle had failed to comply with Hunt's request or respond in any way to it, and Plaintiff was paid these amounts on March 24, 2004.

In opposition, Plaintiff contends that sections 3931(b) and 3933(a) impose the independent obligation on the contractor to pay a subcontractor that has satisfied its contractual performance. Hence, Hunt cannot avoid liability under the act for payment application 22 because the owner's agent has not yet paid it. Additionally, the evidence supports the conclusion that Hunt's failure to pay applications 20 and 21 was in bad faith and violated section 3935(a) because: (1) in January 2003 Hunt insisted on executed change orders but in December 2003, some eleven months later, Hunt, without explanation, sought payment for the applications from the owner's agent, even though the change orders had not been executed; and (2) the change orders were in dispute and one of them, change order 27, had actually been paid in the December 2002 payment application.

We reject Plaintiff's position. While sections 3931(b) and 3933(a) obligate a contractor to pay a subcontractor that has satisfied its contractual performance, sections 3922 and 3933(c) make that obligation dependent upon payment from the governmental agency. Hence, Hunt has not violated the act in regard to payment application 22 since the owner's agent has yet to pay Hunt. Further, we have already decided that Defendant was entitled to request executed change orders under section 5.2(a)(7) of the subcontract, so Hunt could not have acted in bad faith in doing so.

## V. *Conclusion.*

Based on the forgoing discussion, we will grant Hunt's motion for summary judgment on all of Plaintiff's claims.

*ORDER*

AND NOW, this 17th day of September, 2004, it is ordered that:

1. Defendant's motion for summary judgment (doc. 19) is granted.

2. The Clerk of Court shall enter judgment if favor of Defendant and against Plaintiff on all claims in Plaintiff's complaint.

3. Defendant's counterclaims are placed on the court's trial list for November, 2004. The pre-trial conference will be held November 2, 2004, at 1:30 p.m., and jury selection is scheduled for November 8, 2004, at 9:30 a.m. in Court Room No. 1, ninth floor, Federal Building, 228 Walnut Street, Harrisburg, PA.